# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| MICHIGAN STATE HOUSING DEVELOPMENT AUTHORITY, a public body corporate, | |
| Plaintiff/Counterclaim Defendant, | Dist. Ct. No. 11-_____ |
| v. | Bankr. Ct. Adv. Proc. No. 09-01728 |
| LEHMAN BROTHERS DERIVATIVE PRODUCTS INC. and LEHMAN BROTHERS HOLDINGS INC., | |
| Defendants, | |
| and | |
| LEHMAN BROTHERS SPECIAL FINANCING, INC., | |
| Defendant/Counterclaim Plaintiff, | |
| and | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Intervening Defendant/Counterclaim Plaintiff. | |

## MEMORANDUM IN SUPPORT OF MICHIGAN STATE HOUSING DEVELOPMENT AUTHORITY'S MOTION TO WITHDRAW THE REFERENCE

## TABLE OF CONTENTS

**FACTUAL BACKGROUND** ............................................................................................**5**

**PROCEDURAL BACKGROUND** ................................................................................**10**

**ARGUMENT** ...............................................................................................................**12**

   I.   THIS ADVERSARY PROCEEDING PRESENTS NON-CORE CLAIMS ...................14

   II.  OTHER CONSIDERATIONS SUPPORT A FINDING OF CAUSE TO WITHDRAW
       THE REFERENCE.....................................................................................................19

     A. Withdrawal of the Reference Serves the Interests of Judicial Economy and Avoids Delay
        and Expense to the Parties................................................................................................19

     B. Withdrawal of the Reference Allows for the Speedy Determination of an Issue of First
        Impression that is Critical to the Global Financial Markets............................................21

**CONCLUSION** ..........................................................................................................**244**

# TABLE OF AUTHORITIES

## CASES

Page(s)

*176-60 Union Turnpike, Inc. v. Howard Beach Fitness Ctr., Inc.*,
209 B.R. 307 (S.D.N.Y. 1997)..................................................................14

*Access Care, Inc. v. Sten-Barr Network Solutions, Inc. (In re Access Care, Inc.)*,
333 B.R. 706 (Bankr. E.D. Pa. 2005) ..............................................16

*Bankruptcy Servs. V. Ernst & Young (In re CBI Holdings Co., Inc.)*,
529 F.3d 432 (2d Cir. 2008)...........................................................15, 17

*Beard v. Braunstein*,
914 F.2d 434 (3d Cir. 1990).............................................................16

*Five Mile Capital II SPE ESH LLC v. Cerberus Capital Mgmt. (In re Extended Stay)*,
435 B.R. 139 (S.D.N.Y. 2010).......................................................18, 19

*In re Chateaugay Corp.*,
86 B.R. 33 (S.D.N.Y. 1987)....................................................4, 13, 19, 22

*In re FMI Forwarding Co., Inc.*,
No. 01-09462, 2004 WL 1348956 (S.D.N.Y. June 16, 2004) .........................14

*In re McMahon*,
222 B.R. 205 (S.D.N.Y. 1998)...........................................................20

*In re Parklane/Atlanta Joint Venture*,
927 F.2d 532 (11th Cir. 1991) .....................................................19, 22

*In re Wedtech Corp.*,
94 B.R. 293 (S.D.N.Y. 1988)............................................................20

*Jones v. Ford Motor Credit Co.*,
358 F.3d 205 (2d Cir. 2004)............................................................18

*Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd.*,
422 B.R. 407 (Bankr. S.D.N.Y. 2010) ....................................... *passim*

*Lombard-Wall, Inc. v. N.Y.C. Hous. Dev. Corp. (In re Lombard-Wall, Inc.)*,
48 B.R. 986 (S.D.N.Y. 1985).............................................................17

*Luam Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*,
304 F.3d 223 (2d Cir. 2002)..............................................................16

*Marshall v. Stern (In re Marshall)*,
    600 F.3d 1037 (9th Cir.), *cert granted*, 131 S.Ct. 63 (2010) ............................................18

*McHale v. CitiBank, N.A.*,
    No. 09-06064, 2009 WL 2599749 (S.D.N.Y. Aug. 24, 2009)..........................................21

*Mishkin v. Ageloff*,
    220 B.R. 784 (S.D.N.Y. 1998)...................................................................................19, 20

*Mt. McKinley Ins. Co. v. Corning Inc.*,
    399 F.3d 436 (2d Cir. 2005)...........................................................................................16

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982)....................................................................................................15, 17

*Official Committee of Unsecured Creditors of VWE Group, Inc. v. Amlicke (In re VWE Group, Inc.)*,
    359 B.R. 441 (S.D.N.Y. 2007).........................................................................................14

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
    4 F.3d 1095 (2d Cir. 1993).......................................................................4, 13, 16, 19, 20

*S. St. Seaport Ltd. P'ship v. Burger Boys (In re Burger Boys)*,
    94 F.3d 755 (2d Cir. 1996)....................................................................................4, 13, 14

*Solutia Inc. v. FMC Corp.*,
    No. 04-02842, 2004 WL 1661115 (S.D.N.Y. July 27, 2004)................................16, 20, 21

*United Orient Bank v. Green (In re Green)*,
    200 B.R. 296 (S.D.N.Y. 1996)........................................................................................16

*United States Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n (In re United States Lines, Inc.)*,
    197 F.3d 631 (2d Cir. 1999)............................................................................................17

## STATUTES, RULES AND LEGISLATIVE MATERIALS

11 U.S.C. §560...............................................................................................3, 11, 21

28 U.S.C. § 157 ................................................................................................ *passim*

28 U.S.C. § 1334....................................................................................................12

Fed. R. Bankr. P. 5011(a) ........................................................................................3

H.R. Rep. No. 101-484 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223 ...........................................23

S. Rep. No. 101-285 (1990), *available at* 1990 WL 259288........................................................23

1990 Bankruptcy Amendments, Pub. L. No. 101-311, 104 Stat. 267 ...........................................23

## OTHER AUTHORITIES

1 *Collier on Bankruptcy* ¶ 3.02[3][d](i) (15th rev. ed. 2010) ........................................................17

In an order dated September 20, 2010, this Court granted leave to hear an interlocutory appeal from a highly controversial decision of the bankruptcy court in the Lehman Brothers bankruptcy case, *Lehman Brothers Special Financing Inc. v. BNY Corporate Trustee Servs. Ltd.*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) ("*BNY Trustee*"), which had broadly construed the Bankruptcy Code's prohibition on "*ipso facto*" provisions.  The bankruptcy court had held that the "flip clause" in a complex synthetic collateralized debt obligation structure—which by its terms would have permitted investors to come ahead of Lehman Brothers Special Finance ("LBSF") in the "waterfall" distribution of the collateral securing the underlying obligations— was unenforceable as an invalid "*ipso facto*" clause.[1]

In granting leave to bring an interlocutory appeal from that determination, this Court noted that although the bankruptcy court styled its decision as "interlocutory," it was not necessary to determine whether that order (which in fact resolved all matters pending before the bankruptcy court between the parties) was "final," because it was "readily apparent that the Order satisfies the requirements for granting an interlocutory appeal."  Sept. 20 Order at 10.  In support of that conclusion, the Court pointed to the decision's "far-reaching ramifications for the international securities markets" and the "significant uncertainty" the decision had created in the financial community by calling into question billions of dollars in securitization transactions.  *Id.* at 15-16.  The decision's "potentially game-changing effect on the structured finance business *does* militate in favor of reviewing the decision *now*—not months, or even years, from now."  *Id.* (emphasis in original).

---

[1]     Decision and Order Granting BNY Corporate Trustee Services Limited's Motion For Leave to Appeal *Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd.*, S.D.N.Y. M-47 (CM) (Sept. 20, 2010) ("Sept. 20 Order") (attached hereto as Appendix A).

The Michigan State Housing Development Authority ("MSHDA") is one of many derivatives counterparties involved in a dispute in the Lehman Brothers bankruptcy emerging out of the bankruptcy court's *BNY Trustee* decision.  While MSHDA is a party to a relatively straightforward series of interest-rate swaps—not an exotic and complex securitization structure—the bankruptcy court's far-reaching reasoning in *BNY Trustee* also calls into question the enforceability of a provision in an agreement MSHDA reached with LBSF in September 2008.  LBSF contends, just as it did with respect to the "flip clause" in *BNY Trustee*, that the contractual provision setting out the methodology for liquidating the parties' swap agreement cannot be enforced because it is an invalid *ipso facto* provision.  For that reason, MSHDA sought and received leave to file a brief in this Court in the *BNY Trustee* case, which joined in the *amicus* brief filed by the International Swaps and Derivatives Association ("ISDA").[2]  In that *amicus* brief, ISDA argued that the bankruptcy court's overly narrow construction of the Bankruptcy Code's derivative safe-harbor provisions (which are intended to *permit* the enforcement of *ipso facto* provisions controlling the termination and liquidation of derivatives contracts) threatened the sound functioning of the derivatives markets.

After this Court had decided to grant an interlocutory appeal in *BNY Trustee* to provide greater clarity and certainty to the marketplace and this area of the law, the parties to that dispute settled, preventing this Court from reaching the important issues presented.  In the meantime, events have borne out this Court's prediction that the bankruptcy court's decision in *BNY Trustee* would engender "substantial uncertainty" in the marketplace.  The debtors in the Lehman Brothers bankruptcy cases have filed lawsuits challenging securitization transactions worth

---

[2]      ISDA's *amicus* brief is attached as <u>Appendix B</u>.  MSHDA's joinder is attached as <u>Appendix C</u>. The *amicus* brief of the Securities Industry and Financial Markets Association ("SIFMA") is attached as <u>Appendix D</u>.  As described in the MSHDA joinder, counsel to MSHDA herein served as counsel to ISDA in connection with the *amicus* filing.

billions of dollars.[3]  And the bankruptcy court has stayed all of those proceedings during the

pendency of mandatory mediation, effectively depriving the parties of the opportunity to litigate

the matter at all, let alone seek review on the merits in this Court.[4]  In the interim, of course, the

bankruptcy court continues to adhere to the reasoning of *BNY Trustee*—while the correctness of

that decision remains very much unresolved.  *See* Order, *Lehman Bros. Special Fin. Inc. v.*

*Ballyrock ABS CDO 2001-1 Ltd.*, No. 09-01032 (Bankr. S.D.N.Y. May 12, 2011) (denying a

motion to dismiss on the ground that provision relating to termination of swap agreement

"appears to function as an unenforceable *ipso facto* clause" unprotected by the Bankruptcy

Code's safe harbor provisions).

MSHDA accordingly moves this Court, pursuant to 28 U.S.C. §157(d) and Rule 5011(a)

of the Federal Rules of Bankruptcy Procedure, to withdraw the reference of its adversary

proceeding with LBSF, so that it may decide these issues of great legal and practical significance

with the appropriate expedition.  By doing so, this Court can provide the clarity and certainty the

financial markets urgently need, and that this Court would have provided in its *BNY Trustee*

decision had the parties not settled.  The principal argument that MSHDA would advance in

support of a motion for summary judgment in this litigation is fundamentally the same one that

ISDA and SIFMA put forward in their *amicus* briefs in *BNY Trustee*—that the safe harbor

provisions set forth in Section 560 of the Bankruptcy Code exempt from "*ipso facto*" challenge

contractual agreements addressing the calculation and payment of amounts due in connection

---

[3]      *See Lehman Bros. Special Fin. Inc. v. Bank of Am. Nat'l Ass'n*, No. 10-04331 (Bankr. S.D.N.Y.);
*Lehman Bros. Special Fin. Inc. v. US Bank Nat'l Ass'n*, No. 10-03542 (Bankr. S.D.N.Y.); *Lehman Bros.*
*Fin. Prods. Inc. v. US Bank Nat'l Ass'n*, No. 10-03543 (Bankr. S.D.N.Y.); *Lehman Bros. Fin. Prods. Inc.*
*v. Bank of N.Y. Mellon Trust Co., Nat'l Ass'n*, No. 10-03544 (Bankr. S.D.N.Y.); *Lehman Bros. Special*
*Fin. Inc. v. Bank of N.Y. Mellon Trust Corp.*, No. 10-03545 (Bankr. S.D.N.Y.); *Lehman Bros. Fin. Prods.*
*Inc. v. Bank of N.Y.  Mellon Trust Co., Nat'l Ass'n*, No. 10-03546 (Bankr. S.D.N.Y.).

[4]      Order Staying Avoidance Actions And Granting Related Relief, *In re Lehman Bros. Holdings,*
*Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 20, 2010) (Dct. # 12199) (Attached as Appendix E).

with a terminated swap agreement.  If that common-sense position, firmly grounded in the statutory text, were to prevail, the massive disruption and uncertainty resulting from LBSF's litigation campaign—an effort that flies directly in the face of the purpose of the bankruptcy safe harbor provisions—would promptly be put to rest.

A district court has ample discretion under 28 U.S.C. § 157(d) to withdraw the reference over any matter pending in the bankruptcy court.  In the usual run of cases, courts look to an array of factors, including "(1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors."  *S. St. Seaport Ltd. P'ship v. Burger Boys (In re Burger Boys)*, 94 F.3d 755, 762 (2d Cir. 1996); *see Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993).  While these factors—even on their own terms—counsel in favor of withdrawing the reference here, courts view cases raising important unresolved legal issues through a somewhat different lens.  In cases like this one, the fact that the district court's withdrawal of the reference will broadly serve the objectives of "judicial economy" by avoiding "protracted uncertainty" weighs heavily in the balance.  *In re Chateaugay Corp.*, 86 B.R. 33, 39 (S.D.N.Y. 1987).  Accordingly, for the same reasons this Court identified in granting interlocutory review in *BNY Trustee*—the importance to financial markets of resolving the question whether *ipso facto* provisions in derivatives contracts can be enforced according to their terms—this Court should withdraw the reference over this dispute, and set a schedule providing for the expeditious resolution of this matter on summary judgment.

# FACTUAL BACKGROUND

MSHDA was created by the legislature of the State of Michigan under Public Act 346 of 1966.  MSHDA administers a number of federal housing programs, and provides financial and technical assistance, through public and private partnerships, to create and preserve affordable housing in neighborhoods throughout the State of Michigan, including many of those most severely affected by the economic downturn.

MSHDA finances its activities through the sale of tax-exempt and taxable bonds and notes to private investors.  Specifically, MSHDA issues fixed rate debt and variable-rate demand obligations ("VRDOs"), the proceeds of which are loaned to multi-family developers and single-family home owners.  MSHDA issues debt based on the type of deal and the market conditions at time of issuance with the goal of achieving the lowest cost of borrowing possible in support of MSHDA's housing mission.  Cost savings achieved through the financing structure are passed on to the borrower in an effort to maximize the production and ownership of affordable housing. In order to offset the risk of the floating interest rates associated with VRDOs—and not for speculative purposes—MSHDA entered into several interest-rate swap transactions ("Transactions") with Lehman Brothers Derivatives Products, Inc. ("LBDP").

*The Original Agreement.*  On May 10, 2000, MSHDA and LBDP entered into an ISDA master agreement ("Master Agreement") and schedule ("Schedule," and collectively with the Master Agreement and Confirmations, "Agreement"), which memorialized the rights and obligations of the parties as to all swap Transactions.[5]

The Agreement provided that either party could terminate the Transactions upon an "Event of Default" by the other party (such as a payment default or a bankruptcy filing) or a

---

[5]     The operative transactional documents and relevant correspondence are collected in <u>Appendix F.</u>

"Termination Event."  *See* Master Agreement §5.  However, the Agreement provided for two different methods of termination, depending on whether the Event of Default or Termination Event constituted a "Trigger Event," as defined in the Agreement.

Upon an Event of Default or a Termination Event that was *not* a Trigger Event, the appropriate party had the right to designate an "Early Termination Date" for all outstanding Transactions.  *See* Master Agreement §6(a); Schedule Part 1(i)(1).  The Transactions would be terminated as of that date, and the parties would not be required to make further payments or deliveries relating to those Transactions.  *See* Master Agreement §6(c).  Instead, the amounts owed (such as a Settlement Amount in respect of the termination of the Transactions) would be calculated according to the appropriate provisions of the Master Agreement and Schedule.  *See* Master Agreement §6(e).  The Agreement provided that "Market Quotation" and the "Second Method"—very common methodologies for closing out derivatives positions—would be used to calculate any amounts owed due to such an Early Termination.  *See* Schedule Part 1(f); Master Agreement §6(e)(i).  Specifically, the Settlement Amount would be calculated by determining the "Market Quotations" for each "Terminated Transaction," except for those Transactions for which a Market Quotation could not be determined or "would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result."  Master Agreement, Def. Settlement Amount at 13.  As to those Transactions, the "Loss" method would apply.  *Id.*  The ultimate goal of both methods (as is common in derivatives transactions) is to ensure that the non-defaulting party could recover the replacement cost of the transaction—even if there was a substantial difference between the "bid" and the "ask" price for replacing the transaction.

By contrast, upon the occurrence of a Trigger Event—including a bankruptcy filing by LBDP's parent corporation, Lehman Brothers Holdings, Inc. ("LBHI")—the Agreement was

subject to *mandatory* termination.[6]  LBDP was required to send a notice to MSHDA within one business day after becoming aware of the occurrence of such an event, designating an Early Termination Date of no later than the fifth business day following the notice.  *See* Schedule Part I(i)(1).  In addition, instead of applying the customary Market Quotation methodology described above to determine the Settlement Amount (under which the non-defaulting party received the replacement cost of the trade), the Schedule to the Master Agreement provided for the application of a customized "mid-market" methodology to calculate the Settlement Amount, under which the parties would effectively split the difference between the "bid" and "ask" price for replacing the transaction.  *See* Schedule Part 1(g)(ii)(3).  Specifically, the "Market Quotation" for each Terminated Transaction would be an amount determined by LBDP "using Market Rates and Volatilities and by polling the Dealer Group as required, to be the mid-market value of the Transaction as of the close of business (New York time) on the Early Termination Date." Schedule Part 1(i)(2).[7]

    *The Assignment Agreement.*  On September 15, 2008, LBHI filed for bankruptcy, constituting a Trigger Event under the Agreement.  But LBDP did not send the required notice under Part 1(i)(1) of the Schedule.  Instead, Lehman representatives approached MSHDA— along with a number of other public entity counterparties, who now find themselves facing a similar situation to that confronting MSHDA—with an alternative proposal.  Lehman proposed

---

[6]     LBSF, LBDP, and LBHI are collectively referred to as Lehman.

[7]     Unlike other Lehman entities, LBDP was a "bankruptcy remote" entity that held a AAA credit rating, making it a more attractive counterparty, particularly for public entities.  As part of maintaining that rating, LBDP was established as an "automatic terminating" entity, which meant that upon the occurrence of a "Trigger Event," LBDP was *required* to terminate all of its open derivatives transactions. The unusual "mid-market" methodology was a feature of this "automatic termination" feature—making it possible for LBDP to terminate all of its open transactions without incurring the losses associated with the more standard methodology, under which the counterparty would terminate the transaction at the price on the counterparty's side of the trade.

that the parties enter into an agreement, on a form prepared by Lehman, that assigned LBDP's rights and obligations to LBSF, and made other substantive amendments (the "Assignment Agreement").

Under the terms of the Assignment Agreement, which the parties entered into on September 16, 2008, LBDP assigned the Agreement to its affiliate, LBSF—the same LBHI subsidiary involved in the *BNY Trustee* litigation.  In addition, the Assignment Agreement amended the Schedule to delete the bankruptcy-related Trigger Events in Part 1(g) of the Schedule.  The Assignment Agreement, as executed by the parties, was in exactly the form proposed by Lehman.

The Assignment Agreement also included provisions regarding the calculation of the Settlement Amount for particular Transactions.  *See* Assignment Agreement at ¶2.  Specifically, the Assignment Agreement provided that if the Transactions were terminated for any reason *other than* (a) LBSF filing for bankruptcy or (b) LBSF failing to pay or deliver in accordance with its obligations under the Agreement, LBSF had the right to determine the Settlement Amount using the customized "mid-market" definition of Market Quotation set forth in Part 1(i)(2) of the Schedule.  If the Agreement was terminated for either of those two reasons, however, then, consistent with the provisions of the original Master Agreement that listed these occurrences as Events of Default, MSHDA had the right to calculate the Settlement Amount according to the standard Market Quotation and the Second Method, "pursuant to Section 6 of the Agreement."  *See* Assignment Agreement at ¶2 (referring specifically to those two events as "Event[s] of Default described in 5(a)(i) or Section 5(a)(vii)"); *cf.* Schedule Part 1(f); Master Agreement §6(e)(i).

*Termination of the Assignment Agreement.*   On October 3, 2008, just weeks after the parties entered into the Assignment Agreement, LBSF filed for bankruptcy.  Accordingly, on November 5, 2008, MSHDA declared an Event of Default under Section 5(a)(vii) of the Master Agreement and specified November 5, 2008, as the Early Termination Date.  *See* Nov. 5, 2008 Letter.  On November 7, 2008, MSHDA notified Lehman that the Settlement Amount, as calculated by MSHDA and owed to LBSF, was $36,346,426.  *See* Nov. 7, 2008 Letter.  Per the Assignment Agreement, MSHDA determined the Settlement Amount using the standard Market Quotation provisions set forth in the Master Agreement.[8]  *See* Assignment Agreement ¶2; Schedule Part 1(f); Master Agreement §6(e)(i)(3).  MSHDA wired this total amount due and owing to LBSF according to the instructions provided in the Master Agreement.  *See* Nov. 7, 2008 Letter at 2.

*Hedging transactions.*  MSHDA ultimately elected to enter into a new series of hedging transactions with Barclays ("Hedging Transactions") for sixteen of the twenty Terminated Transactions.  The Hedging Transactions are similar in structure to the Terminated Transactions, but they contain inferior credit terms, leaving MSHDA in a worse credit position than it had been prior to the Event of Default, and thus resulting in a slightly greater upfront payment from Barclays.[9]

---

[8]     For seventeen of the twenty Terminated Transactions, three firms provided quotations.  As required by the Agreement's definitions of "Market Quotation" and "Settlement Amount," MSHDA applied the middle quotation.  *See* Master Agreement, Def. Market Quotation and Settlement Amount at 12-13; *See* November 5, 2010 Calculation Memo ("Calculation Memo") at 2.

For the remaining three transactions, only two firms provided quotations.  *See* Calculation Memo at 1.  Accordingly, MSHDA could not determine Market Quotation in accordance with the definition provided in the Master Agreement; instead, MSHDA appropriately calculated the amount due for the remaining three transactions by applying "Loss" method.  *See* Master Agreement, Def. Settlement Amount at 13; *See* Master Agreement, Def. Market Quotation at 12-13; Nov. 7, 2008 Letter at 2.

[9]     Because the Hedging Transactions are substantially different from the original swaps MSHDA entered into with Lehman, they do not constitute "Replacement Transactions" within the meaning of the ISDA Master Agreement (*see* Section 12 of ISDA Master Agreement (included within Appendix F),

*LBDP's improper demand for payment on the Terminated Transactions.*  Although the parties' agreements were terminated on November 5, 2008, LBDP nevertheless sent a notice on November 28, 2008, to US Bank ("USB"), which served as MSHDA's bond trustee, demanding payment of the regular semi-annual premium under the swap agreement.[10]  *See* Nov. 28, 2008 Notice.  In response to that notice, on or about December 1, 2008, USB transferred $2,390,915.82 of MSHDA's funds to LBDP.

In the days following the transfer, Lehman representatives acknowledged that the transfer was a mistake and promised to return the funds to MSHDA.  When the funds were not returned, MSHDA wrote to LBDP demanding return of the funds.  *See* Aug. 14, 2009 Letter.  The letter explained in relevant part that the transfer was erroneous because, *inter alia*, MSHDA had previously terminated the agreement as a result of LBSF's default.  LBDP neither responded to the letter nor returned the funds.

## PROCEDURAL BACKGROUND

MSHDA's original lawsuit against Lehman arose, simply enough, out of its efforts to recover the approximately $2.4 million that LBDP had improperly directed USB to deduct from MSHDA's account after termination of the swap agreement.  On November 16, 2009, MSHDA filed an adversary proceeding in the bankruptcy court against LBHI, LBSF, and LBDP seeking the return of the $2,390,915.82 erroneously wired to LBDP, asserting state-law theories of unjust enrichment, common-law and statutory conversion, and constructive trust.[11]  MSHDA also sought a declaratory judgment providing, *inter alia*, that the funds were MSHDA's property, that

---

definition of Market Quotation, which contains the definition of the defined term "Replacement Transaction").

[10]      The relevant documents relating to the improper demand are collected in Appendix G.

[11]      The pleadings (without exhibits) in this adversary proceeding are collected under Appendix H.

- 10 -

MSHDA was entitled to immediate possession of those funds, and that LBDP must immediately return the funds along with interest, costs, and attorney fees.  *See* Compl. at ¶¶46-50.

On January 13, 2010, LBSF, LBDP, and LBHI filed an Answer denying MSHDA's claims and raising affirmative defenses.  In that same filing, LBSF counterclaimed for breach of contract on the ground that MSHDA had improperly applied Market Quotation and the Second Method, thereby undervaluing the Settlement Amount.  *See* Counterclaim ¶¶1, 13, 23.  LBSF also filed a counterclaim against MSHDA for unjust enrichment, alleging that "MSHDA entered into replacement transactions pursuant to which MSHDA received value that it otherwise would not have received if it had not terminated the Transactions and the Swap Agreement." Counterclaim ¶ 23.  While challenging MSHDA's calculation of the Settlement Amount, the Lehman counterclaims never suggested that the Assignment Agreement was not controlling and enforceable, or otherwise amounted to an invalid *ipso facto* provision under the Bankruptcy Code.  MSHDA answered LBSF's Counterclaims on January 22, 2010.

Shortly thereafter, the adversary proceeding was stayed in favor of mandatory alternative dispute resolution procedures.  *See* Stipulation and Order to Stay Adversary Proceeding (Mar. 12, 2010); *see also* Stipulation and Order to Stay Adversary Proceeding (June 17, 2010) (extending the stay until July 15, 2010).  The parties attended a mediation on December 17, 2010.  That mediation concluded without resolution on December 28, 2010.

On January 25, 2010, the bankruptcy court decided *BNY Trustee*.  In that decision, the bankruptcy court held, among other things, that the right to terminate or liquidate a swap agreement under 28 U.S.C. § 560 does not include the right to enforce any contractual provision that involves "the alteration of rights as they then exist." *Id*. at 421.  The bankruptcy court entered an order memorializing that decision on July 19, 2010.  BNY Corporate Trustee

("BNY") timely moved for leave to appeal.  Recognizing the "extraordinary circumstances" presented by the decision, the "potentially far-reaching ramifications" of the decision on the international securities markets, and the "uncertainty in the financial community" triggered by the decision, the district court granted BNY's motion for leave to appeal.  Sept. 20 Order at 16-17.  Following briefing on the merits, the parties entered into a settlement agreement that mooted the appeal, and thereby preserved the *BNY Trustee* precedent.

Upon the completion of the mediation, Lehman amended its counterclaim against MSHDA to assert a new theory—that the terms of the Assignment Agreement could not be enforced as they were written, because they amounted to an improper "*ipso facto*" provision under the reasoning of the *BNY Trustee* decision.  *See* Amended Counterclaim.  Lehman's new theory is that the provision of the Assignment Agreement permitting MSHDA to terminate its agreement using the standard "Second Method" and "Market Quotation" methodologies that applied in the event of an LBSF bankruptcy amounts to an invalid *ipso facto* clause under the Bankruptcy Code.  As a result, Lehman contends that the "mid-market" methodology ought to be applicable, and it contends that MSHDA accordingly owes it an additional $23 million (plus interest at the contractual default rate).  Amended Counterclaim ¶ 39-41.

## ARGUMENT

District courts have jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334.  Under 28 U.S.C. § 157(a), these proceedings can be "referred" to the bankruptcy courts.  Most district courts, including this Court, provide for the automatic referral of their bankruptcy jurisdiction to the bankruptcy

courts.[12/]  But the district court is permitted, for "cause," to withdraw the reference, "in whole or in part," with respect to any bankruptcy case, or any proceeding within a bankruptcy case.  28 U.S.C. § 157(d).

While "cause" is not defined, the Second Circuit has identified various factors district courts should consider in making such a determination:  "(1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors."  *In re Burger Boys*, 94 F.3d at 762; *In re Orion Pictures Corp.*, 4 F.3d at 1101.  Courts in this district have also offered the common-sense observation that significant issues of first impression, or those with overarching importance beyond the particular disputes in which they arise, militate in favor of finding "cause."  *See, e.g.*, *In re Chateaugay Corp.*, 86 B.R. 33 (S.D.N.Y. 1987) (noting the presence of issues of first impression and of national importance factors supporting withdrawal of the reference).

Here, as explained in greater detail below, there is more than sufficient cause to withdraw the reference.  The Counterclaims in this adversary proceeding involve state and common-law claims that relate to a prepetition contract and that are not necessary to the decision of any proceedings already before the bankruptcy court.  Because the district court would be required to review *de novo* any findings of fact and conclusions of law submitted by the bankruptcy court in connection with the Counterclaims, judicial efficiency is promoted by having this adversary proceeding considered by the district court in the first instance.  Even apart from the standard of review, avoiding a two-tiered review process reduces costs to the parties and minimizes delay—

---

[12/]     *See* United States District Court for the Southern District of New York Standing Order, signed July 10, 1984.

points of particular importance to MSHDA, a public entity that has been waiting over a year to have its claim and the claims against it adjudicated.  Accordingly, there is more than sufficient basis to withdraw the reference even apart from the jurisprudential importance—and the substantial market consequences—of the issues presented by this case.

More fundamentally, however, it would be appropriate for this Court to exercise its discretion in favor of withdrawal of the reference so that it can address the very important question about the scope of the bankruptcy safe harbors that was briefed by the parties in *BNY Trustee*, but that this Court was denied the opportunity to resolve by virtue of the parties' settlement.  As this Court previously recognized, this bankruptcy court's reasoning presents issues of first impression that have "potentially far-reaching ramifications for the international securities markets" and have "triggered significant uncertainty in the financial community."  *See* Sept. 20 Order at 16.  By withdrawing the reference over this matter and deciding it, the Court can take a significant step toward quelling the substantial turmoil that the *BNY Trustee* decision has caused in the financial markets.

I.      **THIS ADVERSARY PROCEEDING PRESENTS NON-CORE CLAIMS**

Lehman's counterclaims in this adversary proceeding are non-core matters.  While that is not necessary for withdrawal of the reference, it weighs in favor of withdrawal.  *See In re Burger Boys, Inc.*, 94 F.3d at 762.[13]  The Bankruptcy Code divides bankruptcy proceedings into "core" and "non-core" matters.  *See* 28 U.S.C. § 157.  A bankruptcy court's authority over core matters

---

[13]      Courts of this circuit have held repeatedly that district courts may determine the nature of the proceeding as core or non-core in the first instance.  *See, e.g.*, *Official Committee of Unsecured Creditors of VWE Group, Inc. v. Amlicke (In re VWE Group, Inc.)*, 359 B.R. 441 (S.D.N.Y. 2007); *In re FMI Forwarding Co., Inc.*, No. 01-09462, 2004 WL 1348956 at *6 n. 5 (S.D.N.Y. June 16, 2004) ("The courts of this Circuit have ruled time and again that, in the context of a withdrawal motion, the district court ruling on such motion does not have to wait for the bankruptcy court to determine whether the claims at issue are core or non-core"); *176-60 Union Turnpike, Inc. v. Howard Beach Fitness Ctr., Inc.*, 209 B.R. 307, 311 (S.D.N.Y. 1997) ("reject[ing] [defendant's] argument that the bankruptcy court alone decides whether a proceeding is 'core' or 'non-core'").

is broad:  A bankruptcy court "may hear and determine . . . all core proceedings arising under title 11 or arising in a case under title 11 . . . . and may enter appropriate orders and judgments," subject to appellate review.  *Id.* § 157(b)(1).  By contrast, the bankruptcy court's authority over non-core matters is limited to "submit[ing] proposed findings of fact and conclusions of law to the district court," which reviews them *de novo.  Id.* § 157(c)(1).

The distinction between "core" and "non-core" matters stems from the Supreme Court's decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co*., 458 U.S. 50 (1982).  The 1978 Bankruptcy Code originally granted bankruptcy courts the broad power to "hear and determine" all disputes that affected the bankruptcy estate—including state-law contract actions by the estate against a third party.  *Marathon* held this broad grant of decision-making authority to non-Article III judges unconstitutional.  The *Marathon* plurality distinguished between "core" bankruptcy matters, such "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power," and other matters, including those involving "the adjudication of state-created private rights, such as the right to recover contract damages," and reasoned that only the former could constitutionally be decided by bankruptcy judges.  *Id*. at 71.  Accordingly, the Court held that the estate's pre-petition contract action against a third party could not be finally determined by the bankruptcy court consistent with Article III.  *Id*. at 87 (plurality opinion); *Id*. at 91-92 (Rehnquist, J. concurring in the judgment).

In response to *Marathon*, Congress amended the bankruptcy jurisdictional provisions in 1984 to distinguish between core and non-core proceedings.  *See Bankruptcy Servs. V. Ernst & Young (In re CBI Holdings Co., Inc.)*, 529 F.3d 432, 461 (2d Cir. 2008).  Under Section 157, core proceedings are those that arise under the Bankruptcy Code or could exist only in a bankruptcy case.  By contrast, non-core proceedings could exist outside of bankruptcy, but may

be heard—though not finally decided—in bankruptcy court because their outcome could affect the bankruptcy estate. *See Mt. McKinley Ins. Co. v. Corning Inc*., 399 F.3d 436, 447 (2d Cir. 2005) ("[T]he distinction between core and non core matters has its roots in the differences between the jurisdiction of the bankruptcy court, an Article I court, and that of the district court, an Article III court."); *United Orient Bank v. Green (In re Green)*, 200 B.R. 296, 298 (S.D.N.Y. 1996) (noting that claim that does not "depend upon the bankruptcy laws for its existence and which could proceed in a court that lacks federal bankruptcy jurisdiction is non-core").

Claims of breach of contract by the estate against a third party—such as LBSF's Counterclaims—are paradigmatic non-core proceedings. Such claims do not invoke the substantive rights created by the Bankruptcy Code and exist independent of the bankruptcy proceeding. *See, e.g.*, *In re Orion Pictures Corp*., 4 F.3d 1095 at 1102 (adversary proceeding in which the debtor alleged the anticipatory breach of a pre-petition contract and sought declaratory relief setting forth the parties' rights and obligations, as well as specific performance and damages, was a non-core proceeding); *Beard v. Braunstein*, 914 F.2d 434, 444 (3d Cir. 1990) (noting that a "garden variety contract claim" is non-core); *Solutia Inc. v. FMC Corp.*, No. 04-02842, 2004 WL 1661115, at *3 (S.D.N.Y. July 27, 2004) (holding breach of contract claim is non-core); *see also Luam Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 229 (2d Cir. 2002) (that a post-petition dispute regarding a pre-petition contract could arise outside of the bankruptcy proceedings "weighs against its core status"); *Access Care, Inc. v. Sten-Barr Network Solutions, Inc. (In re Access Care, Inc.)*, 333 B.R. 706, 711, 713 (Bankr. E.D. Pa. 2005) (opining that claims for breach of contract and unjust enrichment are not core proceedings).[14]

---

[14] This is true even when the conduct that gives rise to the alleged breach occurs post-petition. *See In re Petrie Retail, Inc*., 304 F.3d at 229 (2d Cir. 2002) (stating that the fact that a post-petition dispute

The fact that LBSF's claims are counterclaims in an adversary proceeding brought by MSHDA does not convert those claims—which otherwise would indisputably be non-core—into core proceedings.  Section 157(b)(2)(C) lists, as a category of "Core proceedings," "counterclaims by the estate against persons filing claims against the estate."  28 U.S.C. § 157(b)(2)(C).  But, as this Court has made clear, "[a]lthough this language would appear to extend the bankruptcy court's jurisdiction to all counterclaims, courts have traditionally permitted bankruptcy courts to assert jurisdiction . . . only when there exists some connection between the claims of the creditor and those [brought by the bankruptcy estate]."  *Lombard-Wall, Inc. v. N.Y.C. Hous. Dev. Corp. (In re Lombard-Wall, Inc.)*, 48 B.R. 986, 990-91 (S.D.N.Y. 1985).  That is, in light of the serious constitutional concerns underlying the *Marathon* decision, courts have typically construed Section 157(b)(2)(C) to render only *mandatory* counterclaims "core" matters.  Permissive counterclaims, such as the one LBSF asserts here, are non-core.  *See also In re CBI Holding*, 529 F.3d at 464 (estate's counterclaim against creditor was held to be a core matter because it "share[d] a common transactional nexus with, and raise[d] similar issues of law to," the creditor's claim against the estate); 1 Collier on Bankruptcy ¶ 3.02[3][d](i) (15th rev. ed. 2010) ("counterclaims not arising out of the same transaction should be treated as [within the 'related-to' jurisdiction, and therefore non-core]").[15]

---

regarding a pre-petition contract could arise outside of the bankruptcy proceeding "weighs against its core status"); *United States Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n (In re United States Lines, Inc.)*, 197 F.3d 631, 637-38 (2d Cir. 1999) (Walker, J., other panel members concurring on other grounds) (stating that "a dispute arising from a pre-petition contract will usually not be rendered core simply because the cause of action could only arise post-petition" and noting that "[i]n [*In re Orion Pictures Corp.*, 4 F.3d 1095, 1097 (2d Cir. 1993)], for example, we held to be non-core Orion's cause of action for anticipatory breach of a pre-petition contract . . . even though the event that triggered Orion's claim occurred post-petition").

[15]    While both claims trace their origin to the same contract, LBSF's claim against MSHDA arises out of LBSF's direction to USB on November 28, 2008 to charge MSHDA for a premium payment under the parties' swap agreement, notwithstanding that the agreement had been terminated.  LBSF's counterclaim, by contrast, arises out of MSHDA's calculation of the settlement amount—performed

Indeed, the Ninth Circuit has taken this principle further still, holding that even a *mandatory* counterclaim may be a non-core matter in circumstances in which it is possible to resolve one claim without necessarily resolving the other. *Marshall v. Stern (In re Marshall)*, 600 F.3d 1037 (9th Cir.), *cert granted*, 131 S.Ct. 63 (2010). While that holding is currently pending before the Supreme Court, none of the parties in that case has argued that a *permissive* counterclaim—such as the one at issue here—could be a "core" matter in bankruptcy court.

Nor does the fact that this case involves the appropriateness of the application of the Bankruptcy Code's *ipso facto* and safe harbor provisions make LBSF's counterclaim a core matter. In *In re Extended Stay, Inc.*, this Court rejected the suggestion that the presence of an "*ipso facto*" issue would turn a contract dispute into a core matter. *See Five Mile Capital II SPE ESH LLC v. Cerberus Capital Mgmt. (In re Extended Stay)*, 435 B.R. 139 (S.D.N.Y. 2010). Rather, the Court noted that the plaintiff in that action sought to enforce a contract. The argument that "the underlying obligations . . . are void because of Bankruptcy Code policy disfavoring '*ipso facto*' clauses" arose by way of a defense to the enforcement of that contract, and therefore did not convert the action to one that "arise[s] under the Bankruptcy Code." *Id.* at 149.

While the procedural posture of this action differs from that of *Extended Stay*, the Court's basic reasoning is fully applicable here. At bottom, the fundamental relief sought in both cases was damages for an alleged breach of a pre-bankruptcy contract. There is no suggestion that LBSF is entitled to recover against MSHDA because of a provision of the Bankruptcy Code, or

---

weeks earlier—upon its termination of the agreement. The two claims accordingly do not arise out of the same "transaction or occurrence" in that the "essential facts of the claims" are not "so logically connected" that they must be resolved together. *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004) (defendant's claim to enforce a contract is a permissive counterclaim to plaintiff's allegation that that defendant discriminated in establishing the contract's terms).

that the "Code provides a cause of action" to enforce the prohibition on "*ipso facto*" clauses that is applicable here.  *Id.* at 150.  Rather, LBSF argues that provisions of the parties' agreements are "void as a matter of Bankruptcy Code policy."  *Id.*  No matter how it is pled, that claim cannot give rise to "core" jurisdiction.

## II.   OTHER CONSIDERATIONS SUPPORT A FINDING OF CAUSE TO WITHDRAW THE REFERENCE

Whether a claim is core or non-core—while a factor to be considered—is by no means determinative, particularly in cases presenting legal and practical issues of broad import to the administration of bankruptcy.  "In the final analysis, the critical question is efficiency and uniformity," *Mishkin v. Ageloff*, 220 B.R. 784, 800 (S.D.N.Y. 1998), and the district court "should weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors" to determine whether withdrawal of the reference is appropriate.  *In re Orion Pictures Corp.*, 4 F.3d at 1101.  In addition, in determining cause, the district court should be mindful of the importance of the issues presented in the case and its supervisory function over the bankruptcy courts.  *See In re Parklane/Atlanta Joint Venture*, 927 F.2d 532, 538 (11th Cir. 1991) (the requirement of cause "should not be used to prevent the district court from properly withdrawing reference . . . to fulfill its supervisory function over the bankruptcy courts"); *In re Chateaugay Corp*, 86 B.R. at 39.

### A.   Withdrawal of the Reference Serves the Interests of Judicial Economy and Avoids Delay and Expense to the Parties

The efficient use of judicial resources and the expeditious and economical resolution of litigation weigh heavily in favor of withdrawing the reference and allowing the adversary proceeding to proceed directly in this Court.  Because the claims at issue are non-core, the bankruptcy court's findings and conclusions would in any case be subject to *de novo* review by

- 19 -

this Court, "which could lead to duplication of effort." *Solutia Inc.*, 2004 WL 1661115, at *3

(quoting *In re McMahon*, 222 B.R. 205, 208 (S.D.N.Y. 1998)); *see also In re Orion Pictures*

*Corp.*, 4 F.3d at 1101 (noting that "the fact that a bankruptcy court's determination on non-core

matters is subject to de novo review by the district court could lead the latter to conclude that in a

given case unnecessary costs could be avoided by a single proceeding in the district court").[16]

Even aside from the standard of review, however, expediting what would otherwise be

duplicative proceedings in two courts is warranted in this case.  This adversary proceeding is in

its nascent stages—indeed, other than motions to stay the proceeding pending mandatory

alternative dispute resolution, the bankruptcy court has not held substantive hearings or

considered any contested motion.  There is thus no concern that the district court will be required

to duplicate any effort already expended by the bankruptcy court in this case.  *See Mishkin*, 220

B.R. at 800 (noting that actions subject to withdrawal were in the early stages of litigation and no

motions had been filed, therefore further supporting granting of withdrawal motion); *cf. In re*

*Wedtech Corp.*, 94 B.R. 293, 296 (S.D.N.Y. 1988) (refusing to withdraw reference at the pre-

trial stage where bankruptcy judge held pre-trial hearings and invested judicial resources in the

proceeding).

Avoiding such duplication through withdrawal of the reference minimizes effort and

expense by the court and the parties, and minimizes delay in resolving an issue of critical

importance to bankruptcy administration and the financial markets generally.  For one thing, to

the extent Lehman were to prevail on its position that MSHDA owes it an additional $23 million,

---

[16]      Nor is there reason to believe that MSHDA seeks to withdraw the reference in order to engage in
"forum shopping."  In light of the importance of the issues presented and the substantial amounts at stake,
there can be no question that this matter will eventually reach this Court, where the legal issues, at the
very least, will be subject to *de novo* review.  Accordingly, the question presented in this Motion is not
whether, but only when, this dispute will be heard by this Court.

it would likely argue that it is also entitled to prejudgment interest on that amount, at an annual rate that may be as high as 14 percent.  And, in light of the tremendous work load that the bankruptcy court will face in the coming months in an array of unquestionably "core" matters, including the consideration of a plan of reorganization and an array of other high stakes litigation related to core bankruptcy matters, there is no reason to believe the bankruptcy court will be able to resolve this case more expeditiously than this Court.  *See McHale v. CitiBank, N.A.*, No. 09-06064, 2009 WL 2599749, *5 (S.D.N.Y. Aug. 24, 2009); *Solutia Inc.*, 2004 WL 1661115, at *3 (noting "[b]ankruptcy judges are deluged with matters relating to the administration of bankrupt estates and are the busiest courts in the nation").  Indeed, on the basic contract claim (which is undoubtedly a non-core matter) the bankruptcy court can do no more than enter proposed findings and conclusions that will be subject to *de novo* review in this Court in any event, *see* 28 U.S.C. § 157(c)(1).  Withdrawal of the reference would therefore vastly expedite the ultimate resolution of this matter, potentially avoiding a very substantial prejudgment interest claim in the event that Lehman were to prevail.

### B. Withdrawal of the Reference Allows for the Speedy Determination of an Issue of First Impression that is Critical to the Global Financial Markets

The issue of first impression and global importance raised by this case is a final factor weighing heavily in favor of finding cause and withdrawing the reference.  As noted above, this case turns in substantial part on the correctness of the bankruptcy court's holding in *BNY Trustee*.  LBSF will undoubtedly contend that the provision in the parties' agreement setting forth the formula for the calculation of the "Settlement Amount" applicable in the event of LBSF's bankruptcy is an invalid *ipso facto* clause that is not protected by the Safe Harbor provisions of the Bankruptcy Code, 11 U.S.C. §560.  If MSHDA's principal submission on that question prevails—that the safe-harbor provisions permit the enforcement of a contract term

providing how much is to be paid, and to whom, in the event of a default, including a bankruptcy

default, notwithstanding the Bankruptcy Code's otherwise applicable prohibition of "*ipso facto*"

provisions—a host of other market-unsettling litigation can be brought to a swift conclusion.

Faced with a similar situation, the district court in *In re Chateaugay Corp.* found cause to

withdraw the reference—even over a core matter.  *See In re Chateaugay Corp.*, 86 B.R. at 39.  In

that case, the Pension Benefit Guaranty Corporation sought to withdraw from the bankruptcy

court the debtors' application for orders for enforcement of the automatic stay and for

contempt—two unquestionably core matters.  Consideration of those matters involved significant

issues of first impression of bankruptcy and ERISA law that could impact "hundreds of

thousands of present and future retirees and their employers."  *In re Chateaugay Corp*, 86 B.R. at

39.  The district court noted that "[a]lthough the meaning of 'for cause shown' is not free from

ambiguity . . . the presence of significant issues of first impression, considerations of judicial

economy, and the need to protect participants in the restored Plans from unduly protracted

uncertainty about the status of their benefits together establish sufficient cause for this court to

exercise its discretion to withdraw the reference."  *Id.*  Indeed, a finding to the contrary would

"effectively erase the margin of discretion allotted to district courts under [28 U.S.C. §157(d)]."

*Id.*; *see also In re Parklane/Atlanta Joint Venture*, 927 F.2d at 538 (The cause prerequisite

"should not be used to prevent the district court from properly withdrawing reference . . . to

fulfill its supervisory function over the bankruptcy courts.").

The same is true here.  As this Court acknowledged in its September 20, 2010 Order, the

issues raised in *BNY Trustee* (and presented here) have "potentially far-reaching ramifications for

the international securities markets" and "has triggered significant uncertainty in the financial

community." September 20, 2010 Order at 16.  Recognizing the extraordinary circumstances

presented by the decision, the district court pointed to a variety of commentators who expressed concern over the uncertainty caused by the decision. *See, e.g.*, Aline van Duyn & Nicole Bullock, *Lehman Ruling Creates New Doubts for CDOs*, Fin. Times, Feb. 9, 2010 (stating that "uncertainty looms" as a result of the bankruptcy court's decision, and that the ruling "may turn the conventional wisdom which has driven many of these deals on its head"); Andrew Cavenagh, *Dante's Inferno*, FTSE Global Markets, June 2010, at 14-18 ("[A]ttempts to revive securitization in the US and Europe are hamstrung by doubts over whether a fundamental historical tenet of the business—that securitised bonds are protected from the bankruptcy of the deal's participants—will withstand legal scrutiny."). As this Court noted, even the bankruptcy court understood the "importance" of his ruling "to parties who are not in the room, including . . . market participants who are looking at the risks of securitization transactions in light of the consequences of the *ipso facto* clause as [the bankruptcy court] ha[s] interpreted those consequences." *See* Sept. 20 Order at 16.[17]

Because this case provides an opportunity to address many of the same concerns that led this Court to grant interlocutory review in *BNY Trustee*, this Court should withdraw the reference over this action, and establish a schedule for the prompt consideration of the issues presented herein on a summary judgment record.

---

[17]      Indeed, the *BNY Trustee* decision is causing the very harm that Congress intended to prevent in enacting the safe harbor provisions. In extending the safe harbor provisions to swap agreements, Congress sought to "exempt the liquidation and setoff of mutual debts and claims" of swap agreements and prevent any "volatility in the swap agreement markets resulting from the uncertainty over their treatment in the Bankruptcy Code." *See* H.R. Rep. No. 101-484, at 2-3 (1990), reprinted in 1990 U.S.C.C.A.N. 223, 224-225; *see also* 1990 Bankruptcy Amendments, Pub. L. No. 101-311, 104 Stat. 267; S. Rep. No. 101-285, at 1 (1990), available at 1990 WL 259288, at *1 (the purpose of the bill is "to clarify U.S. bankruptcy law with respect to the treatment of swap agreements"); H.R. Rep. No. 101-484, at 1 (1990) (the purpose of the bill "is to ensure that the swap and forward contract financial markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code").

## CONCLUSION

For the foregoing reasons, the reference to the bankruptcy court should be withdrawn, and this adversary proceeding should proceed in the district court in the first instance.   The Court should further direct that MSHDA's motion for summary judgment (on its affirmative claims) shall be filed within 30 days of an order withdrawing the reference (the "Order Date"); LBSF's combined opposition to MSHDA's motion on MSHDA's claims, and motion for summary judgment on its counterclaims, shall be due 60 days after the Order Date; MSHDA's combined reply in support of its summary judgment and opposition to LBSF's motion for summary judgment shall be due 90 days after the Order Date; and LBSF's reply in support of its motion for summary judgment shall be due 105 days after the Order date.

<div style="margin-left:50%">

Respectfully submitted,

/s/ Craig Goldblatt
Craig Goldblatt (CG 6793)
Danielle Spinelli (DS 7097)
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

Jeannette Boot
WILMER CUTLER PICKERING HALE
AND DORR LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

</div>

Michael Murphy
Jennifer M. Jackson
Assistant Attorney General
State Operations Division
Michigan Department of Attorney General
P.O. Box 30754
Lansing, Michigan 48909
Tel: (517) 373-1162
Fax: (517) 373-2060

*Counsel for Michigan State Housing Development Authority*