Appendix A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

LEHMAN BROTHERS HOLDINGS INC., et al.,

              Debtors.

Chapter 11
No. 08-13555 (JMP)

------------------------------------------------------------x

------------------------------------------------------------x

LEHMAN BROTHERS SPECIAL FINANCING
INC.,

              Plaintiff,

    -against-

BNY CORPORATE TRUSTEE SERVICES
LIMITED,

              Defendant.

Adversary Proceeding
No. 09-01242 (JMP)

------------------------------------------------------------x

## DECISION AND ORDER GRANTING BNY CORPORATE TRUSTEE
## SERVICES LIMITED'S MOTION FOR LEAVE TO APPEAL

McMahon, J.:

### INTRODUCTION

BNY Corporate Trustee Services Limited ("BNY") moves for leave to appeal the July 19,

2010 order (the "Order") of the United States Bankruptcy Court for the Southern District of New

York (Hon. James M. Peck) (the "Bankruptcy Court") granting summary judgment for Lehman

Brothers Special Financing Inc. ("LBSF"). Judge Peck's Order memorialized his memorandum

decision of January 25, 2010, which he described as "break[ing] new ground as to unsettled

subject matter" and likely to be "controversial." Lehman Bros. Special Fin. Inc. v. BNY

Corporate Tr. Servs. Ltd., 422 B.R. 407, 422 (Bankr. S.D.N.Y. 2010) ("LBSF"). For the reasons

set forth herein, BNY's motion for leave to appeal is granted.

Copies mailed/faxed/handed to counsel on 9/29/10

## BACKGROUND

On September 18, 2008, Lehman Brothers Holdings Inc. ("LBHI"), one of the largest investment banks in the U.S. at the time, filed for chapter 11 bankruptcy protection in the Bankruptcy Court. LBSF, 422 B.R. at 411. Eighteen days later, on October 3, 2008, LBSF, an LBHI subsidiary, filed its chapter 11 petition in the Bankruptcy Court. Id. at 413.

On May 20, 2009, LBSF initiated this adversary proceeding (the "Adversary Proceeding") against BNY. Id. at 411. The Adversary Proceeding arises out of a complex series of synthetic collateralized debt obligations ("CDOs") and related credit default swaps, and has been further complicated by the pendency of parallel and potentially conflicting legal proceedings in the United Kingdom (the "English Litigation").

The facts relevant to today's decision are not in dispute, and are set forth below. For additional background information regarding the underlying structured financial transaction, the English Litigation and the proceedings in the Bankruptcy Court, the reader should refer to the Bankruptcy Court's January 25, 2010 decision, see id. at 410-14.

I.      **The Underlying Transaction**

The Adversary Proceeding involves two series of credit-linked synthetic portfolio notes (the "Notes") that are now held by non-party Perpetual Trustee Company Limited ("Perpetual"), an Australian company. LBSF, 407 B.R. at 410, 413. The Notes were secured by various assets and certain secured obligations (the "Collateral"), including credit default swap transactions between LBSF and the issuer of the Notes (a special-purpose vehicle created by Lehman Brothers International (Europe) called Saphir Finance Public Limited Co. ("Saphir")). Id. at 412-13. The Collateral was held by BNY in trust for creditors of Saphir, including LBSF (as

swap counterparty) and Perpetual (as the noteholder). Id. at 413. LBHI was the credit support provider for LBSF's payment obligations under the swap agreements. Id. at 411.

Pursuant to the terms of the Transaction Documents, LBSF's interest in the Collateral ordinarily takes priority over Perpetual's interest—this is called "Swap Counterparty Priority." Id. at 413. However, in the event of a default by LBSF under a swap agreement, the Transaction Documents provide for a "flip" from Swap Counterparty Priority to "Noteholder Priority," such that Perpetual receives payments *before* LBSF. Id. Among the events of default under each of the swap agreements are a filing in bankruptcy of any party to the transaction, including LBSF or LBHI. See id.

On December 1, 2008, after LBHI and LBSF had separately filed for bankruptcy, Saphir exercised its right to terminate the swap agreements, obligating it to redeem the Notes. Id. at 413-14. The question in this Adversary Proceeding is whether the Swap Counterparty Priority or Noteholder Priority distribution scheme applies—i.e., whether Perpetual or LBSF has priority in the payment of proceeds to satisfy Saphir's obligations. BNY holds the Collateral that is subject to these competing claims.

## II.    The English Litigation

On May 13, 2009, Perpetual filed an action against BNY in the High Court of Justice, Chancery Division (the "High Court"), seeking an order requiring BNY to pay it in accordance with Noteholder Priority. LBSF, 422 B.R. at 410. One week later, LBSF intervened in the English Litigation. Id. at 411. After a trial, the High Court (applying English law) ruled in favor of Perpetual, holding, *inter alia*, that Noteholder Priority became effective on September 15, 2008, when LBHI filed for bankruptcy. See Perpetual Tr. Co. Ltd. v. BNY Corporate Tr. Servs. Ltd., [2009] EWHC 1912, 2009 WL 2221998.

LBSF appealed the High Court's judgment. LBSF, 422 B.R. at 412. On November 6, 2009, the English Court of Appeal unanimously affirmed the High Court, finding, *inter alia*, that the event "triggering" the flip from Swap Counterparty Priority to Noteholder Priority "was LBHI filing for Chapter 11 which occurred on 15 September 2008, some 18 days before LBSF filed for Chapter 11." Perpetual Tr. Co. Ltd. v. BNY Corporate Tr. Servs. Ltd., [2009] EWCA (Civ) 1160, ¶ 69, 2009 WL 3643805.

On March 31, 2010, the Supreme Court of the United Kingdom agreed to hear LBSF's appeal. (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. J.) BNY asserts, and LBSF does not dispute, that a hearing is scheduled to take place in March 2011, and that an opinion is expected to issue sometime in late 2011.

## III.    The Adversary Proceeding

### A.    LBSF's Complaint

On the same day it intervened in the English Litigation, LBSF initiated the instant Adversary Proceeding against BNY. LBSF, 422 B.R. at 411.[1] Count I of LBSF's two-count Complaint seeks a declaratory judgment that the contractual provisions modifying LBSF's payment priority upon an event of default "constitute unenforceable *ipso facto* clauses" that violate the Bankruptcy Code, 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B), and that, as a result, "LBSF is entitled to payment under Swap Counterparty Priority." (LBSF, No. 09-01242 (JMP), Docket No. 1 at 10.) Count II seeks a declaratory judgment that any action to enforce such provisions "constitutes a willful violation of the automatic stay under [Bankruptcy Code] section 362(a)(3)." (Id. at 11.)

---

[1] On June 22, 2009, BNY moved to dismiss, arguing that Perpetual is an "indispensable party" under Federal Rule of Civil Procedure 19. LBSF, 422 B.R. at 411. The Bankruptcy Court found that BNY had the capacity to adequately represent Perpetual's interests in the litigation, and denied the motion. Id.

## B.    Inter-Court Communication

From the start, "[t]he interplay between [the Adversary Proceeding] and the English Litigation has been obvious . . . , and both [the Bankruptcy] Court and the English Courts have been aware of the potential for conflicting rulings due to differences in the law being applied." LBSF, 422 B.R. at 411. Judge Peck and the parties agreed that the Bankruptcy Court should "communicat[e] with the High Court regarding coordination of and cooperation with respect to the litigation here and in London." See id. at 412; see also 11 U.S.C. § 1501 et seq. (providing for cooperation and direct communication between U.S. and foreign courts in cases of cross-border insolvencies).

Numerous such inter-court communications have occurred. For example, after LBSF and BNY cross-moved for summary judgment, Judge Peck wrote to the High Court, requesting that it not make any final disposition until "I am able to consider and rule on the United States bankruptcy law issues raised in the summary judgment briefing" and stating that, "Once I have considered and ruled on the issues in the Adversary Proceeding, I intend to communicate further with your Lordship in an attempt to reach a coordinated result in light of each Court's ruling." (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. A at 2.)

The High Court responded that it "look[ed] forward to receiving [the Bankruptcy Court's] rulings in due course and any further requests," and that it welcomed "further co-operat[ion]." (Id. Ex. B at 2.) After the English Court of Appeal affirmed the High Court on November 6, 2009, the High Court sent another letter to the Bankruptcy Court, requesting that it not enter an order that would conflict with the Court of Appeal's judgment—specifically, that the Bankruptcy Court "not . . . make any order which would either (a) require BNY to act in any particular way with the collateral or its proceeds; or (b) declare that BNY is required to act or

deal in any particular way with the collateral or its proceeds, until . . . further communication has taken place between the US and English courts." (Id. Ex. D at 2); see LBSF, 422 B.R. at 412.

**C.     The Bankruptcy Court's Memorandum Decision**

On January 25, 2010, the Bankruptcy Court issued a "Memorandum Decision Granting Motion for Summary Judgment and Declaring Applicable Payment Priorities." LBSF, 422 B.R. 407, 410. Judge Peck's opinion granted summary judgment to LBSF, holding that "the provisions in the Transaction Documents purporting to modify LBSF's right to a priority distribution solely as a result of a chapter 11 filing constitute unenforceable *ipso facto* clauses" under 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B), and that "any attempt to enforce such provisions would violate the automatic stay" under § 362(a). Id. at 420-21. Judge Peck indicated that he would enter a declaratory judgment memorializing the decision. Id. at 422.

At the outset of his opinion, Judge Peck confronted BNY's argument that, pursuant to principles of comity and res judicata, the Bankruptcy Court should defer to the English courts' determinations that LBHI's chapter 11 filing on September 15, 2008 was the trigger event for the flip in payment priorities. Id. at 416. Judge Peck declined to afford preclusive effect to the English judgments because he concluded that the English courts had not taken into account the relevant provisions of U.S. bankruptcy law, which afford debtors broader protections than those available under applicable foreign law. Id. at 417-18.

Judge Peck ultimately reached the scope of the *ipso facto* protections provided by §§ 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code. Those sections prohibit the modification of a debtor's right solely because of a provision in an agreement conditioned on "the commencement of *a case* under this title." 11 U.S.C. §§ 365(e)(1), 541(c)(1)(B) (emphasis added).

6

Relying on his interpretation of the legislative history and "plain meaning" of these *ipso facto* provisions, Judge Peck held that they apply to contract terms conditioned on the commencement of "presumably any [bankruptcy] case that is related in some appropriate manner to the contracting parties." LBSF, 422 B.R. at 419. Judge Peck acknowledged that this interpretation was unprecedented, stating that, "No case has ever declared that the operative bankruptcy filing is not limited to the commencement of a bankruptcy case by the debtor-counterparty itself but may be a case filed by a related entity." Id. at 422. He further admitted that his interpretation of the Bankruptcy Code's *ipso facto* provisions as applying "to cases filed by debtors other than the counterparty itself has the potential of opening up a proverbial 'can of worms' that may lead to speculation as to the nature and degree of the relationship between debtors that is needed in order to properly apply the provision." Id. at 419.

Judge Peck then applied his novel statutory interpretation to the circumstances at hand, and concluded that the separate bankruptcy filings of LBHI and its affiliates, including LBSF, constituted "a singular event" for *ipso facto* purposes—but not for purposes of "any other legal determination that may relate to the date of commencement of a case." Id. at 420. Accordingly, Judge Peck held that LBHI's petition "entitled LBSF, consistent with the statutory language, fairly read, to claim the protections of the *ipso facto* provisions of the Bankruptcy Code because its ultimate corporate parent and credit support provider, at a time of extraordinary panic in the global markets, had filed a case under the Bankruptcy Code." Id.

**D.     Further Communication with the High Court**

At the close of his decision, Judge Peck reiterated that "[the] situation . . . calls for the parties, this Court and the English Courts to work in a coordinated and cooperative way to identify means to reconcile the conflicting judgments," and "direct[ed] that the parties attend a

status conference to be held . . . for purposes of exploring means to harmonize the decisions of this Court and the English Courts." LBSF, 422 B.R. at 423.

After the status conference on February 19, 2010, Judge Peck wrote to the High Court, with the parties' consent, explaining that: "I limited my ruling so as to award only a declaratory judgment as to the nature of United States bankruptcy law on th[e] issue [of whether 'a shift in payment priority to favor Perpetual based on the bankruptcy filings of either LBSF or its corporate parent, [LBHI], would violate the *ipso facto* prohibitions of the United States Bankruptcy Code']. I have not entered an order requiring BNY to tender the collateral to LBSF at this time. Prior to entering any such order, I wish first to communicate with your Lordship in an effort to reach a coordinated resolution of these matters." (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. G at 1.) Judge Peck "request[ed] that Your Lordship recognize and give effect to my January 25, 2010 declaratory judgment in the cases pending before you in a manner that you deem appropriate." (Id. at 2.)

On March 10, 2010, and again on March 31, the date the English Supreme Court accepted LBSF's appeal, the High Court responded, stating that it was "not proposing to have any further hearings pending the outcome of the appeal," and that "the position under English law is unclear until the appeal is decided." (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. J at 1.)

**E.    The Bankruptcy Court's July 19, 2010 Order**

On July 19, 2010, the Bankruptcy Court entered an Order memorializing its January 25 decision in favor of LBSF. In the months following the decision, LBSF had opposed the entry of any such order, forcing BNY to move for the entry of an order. (See Decl. of Randy M. Mastro in Supp. of Mot. of BNY for Leave to Appeal, Aug. 2, 2010 ("Mastro Decl."), Ex. H;

LBSF, No. 09-01242 (JMP), Docket No. 90.)  At the June 30, 2010 hearing on BNY's motion, Judge Peck stated:

> It was never my contemplation, given the existing communication that took place between this Court and the High Court in London, that I was setting up a multiyear double-blind appellate process.  It was, in fact, my view that I was simply entering a memorandum decision that was, at that point, regardless of the form of order, interlocutory in nature. . . .  I am anxious to maintain the cooperative posture with my colleagues in the UK and to be in a position to try to ameliorate the potentially conflicting aspects of applying the law.

(LBSF, No. 09-01242 (JMP), Docket No. 99 at 55.)  Ultimately, at the conclusion of the hearing, Judge Peck decided to enter an order, "because it will at least get us past this episode in the litigation." (Id. at 56.)

Accordingly, a few days later, Judge Peck entered an Order granting LBSF's motion for summary judgment and ordering that:

> the contractual provisions . . . that purport to modify LBSF's payment priority as a result of its chapter 11 filing and the chapter 11 filing of LBSF's corporate parent, [LBHI], are unenforceable *ipso facto* clauses under United States Bankruptcy Code sections 365(e)(1) and 541(c)(1)(B), and any action to enforce such provisions is prohibited by the automatic stay under Bankruptcy Code section 362(a).

(Mastro Decl. Ex. A at 3-4.)  The Order further stated that "in view of this Court's expectation that further coordination and communication between the High Court and this Court shall take place," it is

> ORDERED that, consistent with the statements made by the Court on the record of the hearing on June 30, 2010, this Order is interlocutory; and it is further
>
> ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

9

(Id.) BNY's motion for leave to appeal the Order followed.

## DISCUSSION

BNY first asserts that the Bankruptcy Court's Order is final and therefore appealable as of right pursuant to 28 U.S.C. § 158(a)(1). However, most of the space in BNY's papers is spent arguing that, even if the Order is not final, the Court should grant BNY leave to appeal the Order on an interlocutory basis pursuant to § 158(a)(3).

The Court will assume, without expressly deciding, that Judge Peck's self-styled "interlocutory" Order is, in fact, not final. The Court does so because, as explained below, it is readily apparent that the Order satisfies the requirements for granting an interlocutory appeal. Accordingly, the Court grants BNY's motion for leave to appeal.

## I.    The Bankruptcy Court's Order Warrants Interlocutory Appeal

Appeals from non-final bankruptcy court orders may be taken pursuant to 28 U.S.C. § 158(a)(3). In deciding whether to grant leave to appeal, reviewing courts apply the standards of 28 U.S.C. § 1292(b), which governs interlocutory appeals from district court orders. See, e.g., In re Enron Corp., No. 01-16034, 2006 WL 2548592, at *3 (S.D.N.Y. Sept. 5, 2006).

Interlocutory review is warranted under § 1292(b) if (1) the order being appealed "involves a controlling question of law," (2) there is "substantial ground for difference of opinion" as to that question, and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). As the Second Circuit has cautioned, "use of this certification procedure should be strictly limited because 'only 'exceptional circumstances' [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" In re Flor, 79 F.3d 281, 284 (2d Cir. 1996) (quoting Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 25 (2d Cir. 1990)). "The

decision whether to grant an interlocutory appeal from a bankruptcy court order lies with the district court's discretion." In re Enron Corp., 2006 WL 2548592, at *3.

Here, LBSF concedes that the Bankruptcy Court's Order involves controlling questions of law. (LBSF's Mem. in Opp'n to BNY's Mot. for Leave to Appeal, Aug. 16, 2010 ("LBSF Mem."), at 32.) For the reasons discussed below, the second and third prongs of § 1292(b) are also satisfied.

### A.    There Is Substantial Ground for Difference of Opinion

Substantial ground for difference of opinion "must arise out of a genuine doubt as to whether the Bankruptcy Court applied the correct legal standard." In re Enron Corp., No. 01-16034, 2006 WL 2548592, at *4 (S.D.N.Y. Sept. 5, 2006). The substantial ground requirement may be met when there is conflicting authority on the issue, id., or the issue is "difficult and of first impression" in this Circuit, Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 25 (2d Cir. 1990). Indeed, "When a controlling question of law presents an issue of first impression, permission to appeal is often granted." In re Enron Creditors Recovery Corp., No. 01-16034, 2009 WL 3349471, at *6 (S.D.N.Y. Oct. 16, 2009). However, "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." In re Flor, 79 F.3d 281, 284 (2d Cir. 1996). The district court must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." Id. (internal quotations and citation omitted).

Judge Peck's decision resolved a difficult, dispositive legal question of first impression. He forthrightly acknowledged that his unprecedented ruling—which he predicted would be "controversial"—was the "first such interpretation of the *ipso facto* language" in the Bankruptcy

11

Code. LBSF, 422 B.R. at 422. He stated that he was not aware of any case that "has ever declared that the operative bankruptcy filing is not limited to the commencement of a bankruptcy case by the debtor-counterparty itself." Id. Indeed, prior cases in this and other circuits appear to assume—albeit in circumstances that are factually distinguishable—that the Bankruptcy Code's *ipso facto* provisions invalidate clauses that condition an event of default on the contracting party's *own* bankruptcy filing. See, e.g., In re Chateaugay Corp., No. 92 CIV. 7054(PKL), 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993) (interpreting §§ 365(e)(1) and § 541(c) as "render[ing] unenforceable contract provisions that altered the rights or obligations of a debtor as a result of the *debtor's* commencement of a case under the Bankruptcy Code" (emphasis added)); accord, e.g., In re EBC I, Inc., 356 B.R. 631, 640 (Bankr. D. Del. 2006) (describing *ipso facto* clauses as provisions "by which a contract is terminated as a result solely of the debtor's insolvency or bankruptcy").

In short, Judge Peck's decision involved a difficult question of first impression in this (and, apparently, any other) Circuit. That is enough to establish substantial ground for difference of opinion. See, e.g., Klinghoffer, 921 F.2d at 25; In re Trace Int'l Holdings, Inc., No. 04 Civ. 1295(KMW), 2009 WL 3398515, at *3 (S.D.N.Y. Oct. 21, 2009); Republic of Colom. v. Diageo N. Am., Inc., 619 F. Supp. 2d 7, 11 (E.D.N.Y. 2007).

Furthermore, BNY has pointed to numerous legal and other commentaries questioning the correctness of Judge Peck's ruling. See, e.g., Latham & Watkins LLP, Client Alert, The "Flip" Flap: Lehman Bankruptcy Judge Invalidates Payment Priority Clause, at 4 (May 13, 2010) (Decl. of Randy M. Mastro in Further Supp. of Mot. by BNY for Leave to Appeal, Aug. 23, 2010 ("Mastro Reply Decl."), Ex. B) ("[T]his decision is troubling for a number of reasons . . . ."); Hunton & Williams LLP, Client Alert, Bankruptcy Court Rules for Lehman on Flip

-12-

Clause, at 2 (Feb. 2010) (Mastro Reply Decl. Ex. A) ("[W]e believe that there are significant arguments that the decision is wrong in a number of respects."); Cleary Gottlieb Steen & Hamilton LLP, Alert Memo, Lehman Bankruptcy Court Holds That CDO Provision Subordinating Swap Termination Payments to Lehman Is Unenforceable, at 5 (Jan. 26, 2010) (Mastro Reply Decl. Ex. C) ("This case . . . creates significant uncertainty regarding which contractual provisions constitute unenforceable *ipso facto* clauses under the Bankruptcy Code.").

LBSF meekly responds, citing a single article, that the commentary on the Bankruptcy Court's decision has, in fact, been "mixed." (LBSF Mem. at 40 n.11.) But even that lone article, which predicts that Judge Peck's decision will be upheld on appeal, supports BNY's position that an interlocutory appeal is warranted—it highlights the "groundbreaking nature" of Judge Peck's ruling, and warns of the possibility that "savvy guarantors will soon begin to use the 'related entity bankruptcy' ploy as a means of invalidating *ipso facto* cross-corporate default provisions." Dan Schechter, Debtor's Prepetition Loss of Priority Under Springing Subordination Agreement Triggered by Parent Corporation's Bankruptcy Filing Is Unenforceable Ipso Facto Provision, 2010 Com. Fin. Newsl. 16 (2010). Moreover, even if LBSF were correct that mainstream views are "mixed," that is consistent with the conclusion that "substantial ground for difference of opinion" exists.

In sum, the Court concludes that there is substantial ground for difference of opinion over whether Judge Peck applied the correct legal standard in reaching his decision that LBHI's bankruptcy filing entitled LBSF to claim the protections of the *ipso facto* provisions. Thus, the Bankruptcy Order satisfies the second element required by § 1292(b) for interlocutory appeal.

**B.     Review Will Materially Advance the Ultimate Termination of the Litigation**

The third prong of the § 1292(b) analysis is whether immediate review of the Bankruptcy Court's order "may materially advance the ultimate termination of the litigation." This prong, like the other two, is satisfied.

Judge Peck's decision resolved controlling questions of law that may dispose of the ultimate issue in this Adversary Proceeding—that is, whether Swap Counterparty Priority or Noteholder Priority applies. Accordingly, immediate review of his ruling will materially advance the ultimate termination of the litigation. See In re Enron Corp., No. 01-16034, 2006 WL 2548592, at *8 (S.D.N.Y. Sept. 5, 2006) (finding that "[t]he third prong is easily met" where, as here, "granting leave to appeal . . . may result in the disposition of the Adversary Proceedings in their entirety").

Nor do there appear to be any factual disputes that might impede this Court's review of the Bankruptcy Court's decision. As Judge Peck noted at the outset of his opinion, "The parties acknowledge that there are no genuine issues of material fact and that the questions presented purely involve the application of relevant provisions of the Bankruptcy Code to undisputed facts." LBSF, 422 B.R. at 413.

LBSF, in arguing that immediate review of Judge Peck's Order would *not* materially advance this litigation, relies exclusively on the pendency of the proceedings in England. It asserts that an interlocutory appeal would actually *prolong* the ultimate termination of the litigation because "[t]he Bankruptcy Court would be precluded from effectively communicating with the English court until BNY's appeals are exhausted," and that no such appeal should go forward because it might be rendered "moot" by the final result in the English Litigation. (LBSF Mem. at 38.)

These contentions are easily discounted. LBSF cannot credibly claim that an immediate appeal would delay the ultimate termination of the litigation when LBSF is apparently (if not expressly) taking the position that U.S. courts should essentially do *nothing* while waiting for the English Litigation to run its course. LBSF's assertion that the English Litigation could somehow "moot" any appeal is somewhat puzzling, particularly in light of LBSF's view (adopted by the Bankruptcy Court) that U.S. bankruptcy law governs the dispute.

In the end, it is not difficult to see LBSF's arguments for what they really are: an attempt to use the English proceedings to insulate Judge Peck's decision from appellate review for as long as possible. For many months, LBSF opposed the entry of any order memorializing the Bankruptcy Court's decision; now, it vigorously seeks to forestall any review. LBSF's efforts to shield Judge Peck's unprecedented and—for LBSF—extremely favorable decision from review are, of course, not surprising; indeed, LBSF does not deny that, since the decision was handed down, it has used it as leverage in settlement negotiations concerning billions of dollars worth of similar transactions. LBSF's desire to insulate Judge Peck's ruling from appellate scrutiny only further demonstrates the need for immediate review.

For the reasons set forth above, the Court concludes that the Bankruptcy Court's Order satisfies the third and final requirement for an interlocutory appeal.

**C.  Extraordinary Circumstances Are Present**

The Bankruptcy Court's Order not only meets the § 1292(b) test on its face; it also presents precisely the sort of "extraordinary circumstances" that warrant an interlocutory appeal.

Judge Peck's decision is of obvious and critical importance to the LBHI bankruptcy, as it could allow LBSF to recover billions of dollars from various other structured finance deals that would otherwise be distributed to noteholders. Beyond the LBHI bankruptcy—which is itself a

15

massive and extraordinary proceeding—Judge Peck's interpretation of the Bankruptcy Code's *ipso facto* provisions has potentially far-reaching ramifications for the international securities markets, and has triggered significant uncertainty in the financial community. See, e.g., Aline van Duyn & Nicole Bullock, Lehman Ruling Creates New Doubts for CDOs, Fin. Times, Feb. 9, 2010 (Mastro Decl. Ex. C) (stating that "uncertainty looms" as a result of the Bankruptcy Court's Decision, and that the ruling "may turn the conventional wisdom which has driven many of these deals on its head"); Andrew Cavenagh, Dante's Inferno, FTSE Global Markets, June 2010 (Mastro Decl. Ex. J), at 14-18 ("[A]ttempts to revive securitisation in the US and Europe are hamstrung by doubts over whether a fundamental historical tenet of the business—that securitised bonds are protected from the bankruptcy of the deal's participants—will withstand legal scrutiny."). Indeed, at the June 30, 2010 hearing on BNY's motion for entry of an order embodying the Bankruptcy Court's decision, Judge Peck "recognize[d] the importance" of his ruling "to parties who are not in the room, including . . . market participants who are looking at the risks of securitization transactions in light of the consequences of the *ipso facto* clause as I have interpreted those consequences." (LBSF, No. 09-01242 (JMP), Docket No. 99 at 53-54.)

  LBSF essentially acknowledges that Judge Peck's decision upset market expectations, but counters that "it is perfectly appropriate for a court to upset those expectations if they are contrary to the law." (LBSF Mem. at 40.) That may be. And to be clear, this Court is not suggesting that the financial community's reaction to Judge Peck's decision necessarily casts doubt on its *legal* correctness.[2] But the decision's potentially game-changing effect on the structured finance business *does* militate in favor of reviewing the decision *now*—not months, or even years, from now.

---

[2] Nor, for that matter, should anything in today's decision be interpreted as indicative of whether this Court will or will not uphold Judge Peck's decision; the Court expresses no opinion on the merits of BNY's appeal.

16

DIST EXEC SDNY          Fax:212-805-0392          Sep 20 2010 10:07am   P018/018

In sum, having found that the Bankruptcy Court's Order meets the requirements of § 1292(b) and presents extraordinary circumstances warranting an interlocutory appeal, the Court holds that immediate review of Judge Peck's decision is appropriate.

## **CONCLUSION**

For the reasons set forth above, BNY's motion for leave to appeal the Bankruptcy Court's July 19, 2010 Order is granted. The parties must appear on Friday, October 1, 2010, at 12:30 p.m., for a conference to set an expedited briefing schedule for the appeal.

Dated: September 20, 2010

_____
U.S.D.J.

BY FAX TO ALL COUNSEL

17

Appendix B

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Lehman Brothers Holdings Inc., *et al.*,<br><br>Debtors. | S.D.N.Y. Bankr. Chapter 11<br>No. 08-13555 (JMP) |
| BNY Corporate Trustee Services Limited,<br><br>Appellant,<br><br>v.<br><br>Lehman Brothers Special Financing, Inc.<br><br>Appellee. | No. M 47 (CM)<br><br>S.D.N.Y. Bankr. Adv. Proc.<br>No. 09-01242 (JMP) |

## BRIEF OF *AMICUS CURIAE*
## THE INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION

Philip D. Anker
Jeannette Boot
WILMER CUTLER PICKERING HALE
AND DORR LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

Craig Goldblatt
Danielle Spinelli (DS 7097)
Joel Millar (JM 9254)
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

Counsel for *Amicus Curiae* the International Swaps and Derivatives Association, Inc.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF INTEREST OF AMICUS CURIAE ...............................................3

STATUTORY BACKGROUND.....................................................................................4

ARGUMENT...................................................................................................................10

    I.     THE BANKRUPTCY CODE'S SAFE HARBOR PROTECTS ANY
          "SWAP AGREEMENT," INCLUDING ALL CONDITIONS
          INCORPORATED BY REFERENCE AND RELATED SECURITY
          ARRANGEMENTS.......................................................................................10

    II.    THE BANKRUPTCY CODE'S SAFE HARBOR PROTECTS THE
          RIGHT TO ENFORCE IPSO FACTO CLAUSES TO TERMINATE
          AND LIQUIDATE SWAP AGREEMENTS IN ACCORDANCE WITH
          CONTRACTUAL TERMS. ........................................................................14

          A.    THE RIGHT TO LIQUIDATE A SWAP AGREEMENT
                  INCLUDES DETERMINING AND EFFECTING PAYMENT IN
                  SETTLEMENT OF THE TERMINATED TRANSACTION...................15

          B.    THE SAFE HARBOR PROTECTS CONTRACTUAL
                  PROVISIONS PROVIDING FOR THE "ALTERATION" OF
                  THE DEBTOR'S RIGHTS BY VIRTUE OF THE
                  BANKRUPTCY. ...............................................................................20

    III.   THE BANKRUPTCY CODE DOES NOT INVALIDATE IPSO FACTO
          CLAUSES TRIGGERED BY THE BANKRUPTCY OF A THIRD
          PARTY. .......................................................................................................24

CONCLUSION................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

### CASES

Page(s)

*Cohen v. De La Cruz,*
523 U.S. 213 (1998) .................................................................17

*In re Am. Home Mortg. Holdings, Inc.,*
388 B.R. 69 (Bankr. D. Del. 2008) ......................................18

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,*
878 F.2d 742 (3d Cir. 1989) ...................................................18

*In re Comark,*
971 F.2d 322 (9th Cir. 1992) ...............................................14

*In re Enron Creditors Recovery Corp.,*
422 B.R. 423 (S.D.N.Y. 2009) ........................................6, 14

*In re Lehman Bros. Holdings Inc.,*
422 B.R. 407 (S.D.N.Y. 2010) ...................10, 12, 14, 15, 20

*In re Nat'l Gas Distribs.,*
556 F.3d 247 (4th Cir. 2009) ..................................................9

*In re Residential Res. Mortg. Invs. Corp.,*
98 B.R. 2 (Bankr. D. Ariz. 1989) .........................................18

*Perrin v. United States,*
444 U.S. 37 (1979) ................................................................16

*Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,*
322 F.3d 1039 (9th Cir. 2003) ...........................................6, 10

*United States v. Ron Pair Enters.,*
489 U.S. 235 (1989) ..............................................................15

### STATUTES

11 U.S.C. § 101(53B) ..................................................... *passim*

11 U.S.C. § 362 ...............................................................5, 9, 17

11 U.S.C. § 365 ..............................................................4, 21, 24

11 U.S.C. § 541 ................................................................................................24

11 U.S.C. § 546 ............................................................................................5, 14

11 U.S.C. § 555 ............................................................................................5, 18

11 U.S.C. § 556 ..................................................................................................5

11 U.S.C. § 559 ......................................................................................5, 17, 18

11 U.S.C. § 560 ..........................................................................................*passim*

11 U.S.C. § 704 ................................................................................................19

11 U.S.C. § 726 ................................................................................................19

11 U.S.C. § 741(6) ...........................................................................................18

11 U.S.C. § 752(c) ...........................................................................................18

11 U.S.C. § 1174 ..............................................................................................19

1982 Amendments to Bankruptcy Code, Pub. L. No. 97-222, 96 Stat. 2355 .................................5

1984 Amendments to Bankruptcy Code, Pub. L. No. 98-353, 98 Stat. 333 ...................................5

1990 Bankruptcy Amendments, Pub. L. No. 101-311, 104 Stat. 267 .........................................7

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 ....................................................................................................8

Financial Netting Improvements Act of 2006, Pub. L. No. 109-390, 120 Stat. 2692 ....................9

## LEGISLATIVE MATERIALS

H.R. Rep. No. 97-420 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583 ...........................................5, 6

H.R. Rep. No. 101-484 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223 .........................5, 6, 7, 8, 19

H.R. Rep. No. 109-31 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88 ...............................8, 9, 13, 17

H.R. Rep. No. 109-648 (2006), *available at* 2006 WL 6165926 .....................................................9

S. Rep. No. 98-65 (1983) ......................................................................................................5

S. Rep. No. 101-285 (1990), *available at* 1990 WL 259288 ...................................6, 7, 8, 17, 19

*Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Administrative Practices of the Senate Comm. on the Judiciary*, 101st Cong. 1 (1989) ....................................6, 7

136 Cong. Rec. 13,153 (1990) ...................................................................................................8

## OTHER AUTHORITIES

*5 Collier on Bankruptcy* ¶ 560.02 (16th ed. 2010) ......................................................................13

Black's Law Dictionary (9th ed. 2009) .......................................................................................17

ISDA Market Survey, *available at* http://www.ISDA.org/statistics/pdf/ISDA-Market-Survey-annual-data.pdf........................................................................................................................7

ISDA News Release, Over 94% of the World's Largest Companies Use Derivatives to Help Manage Their Risks, According to ISDA Survey (Apr. 23, 2009), *available at* http://www.ISDA.org/press/press042309der.pdf.........................................................................1

## PRELIMINARY STATEMENT

The International Swaps and Derivatives Association, Inc. ("ISDA") respectfully submits this *amicus* brief to urge the Court to reject the bankruptcy court's erroneous construction of the Bankruptcy Code's "safe harbor" provisions for swap agreements. ISDA appears not for the purpose of advancing the interests of one party over another. Rather, it submits this brief as *amicus curiae* in order to bring to the Court's attention a number of important principles at stake in this appeal that are of vital concern to participants in the swaps and derivatives markets. Although this appeal arises out of certain seemingly exotic Collateralized Debt Obligation ("CDO") transactions, the narrow reading of the safe harbors offered by the bankruptcy court threatens to undermine the protections Congress intended to provide the derivatives markets more broadly. This Court should correct that flawed ruling and reverse the judgment below.

Congress has repeatedly recognized the national interest in ensuring the efficient functioning of the swaps and derivatives markets. Interest-rate, currency, and other swap agreements are vital risk-management tools for businesses, governments and financial institutions around the world, and the swaps markets have grown to a notional outstanding amount estimated at more than $426 trillion. The 2009 ISDA Derivatives Usage Survey shows that more than 94 percent of the Fortune Global 500—471 out of 500 companies—report using derivative instruments to manage and hedge their business and financial risks. *See ISDA News Release: Over 94% of the World's Largest Companies Use Derivatives to Help Manage Their Risks* (Apr. 23, 2009), *available at* http://www.ISDA.org/press/press042309der.pdf.

Congress has acted to protect this important and necessary market from the fundamental upheaval that would result if the Bankruptcy Code prevented market participants from enforcing their contractual rights in the event a counterparty becomes bankrupt. It has thus enacted "safe harbor" provisions to insulate the derivatives markets from bankruptcy-law restrictions,

including those invalidating *ipso facto* clauses.  It also provided, in the broadest possible terms,

that the "exercise of any contractual right … to cause the liquidation, termination, or

acceleration" of a swap agreement because of the debtor's bankruptcy "shall not be stayed,

avoided, or otherwise limited by operation of any provision" of the Bankruptcy Code.  *See* 11

U.S.C. § 560.  In fact, while Congress has carefully considered and debated nearly every facet of

the derivatives market over the past year, culminating in the Dodd-Frank Wall Street Reform and

Consumer Protection Act, the "safe harbor" provisions remain unchanged.

 Notwithstanding the clear statutory language, the bankruptcy court read the safe harbor

narrowly to conclude that it does not protect the Noteholder Priority provision from the

Bankruptcy Code's invalidation of *ipso facto* clauses.  It first determined that the Noteholder

Priority provision was not part of a protected "swap agreement," erroneously construing the

statutory definition to require that parties memorialize the entirety of their agreement within the

four corners of a single document in order for it to qualify as a "swap agreement."  That

interpretation disregards the express terms of the Bankruptcy Code, which define a "swap

agreement" to include all "terms and conditions incorporated by reference," and "any security

agreement or arrangement" that is "related" to the swap agreement.  *See id.* § 101(53B)(A)(i),

(ii), (vi).  Moreover, the bankruptcy court's reading would upend market practice.  Market

participants frequently document derivatives transactions through the use of multiple documents,

supplements and incorporated terms and conditions.  Congress defined "swap agreement" in

sweeping terms precisely in recognition of this market reality.

 The bankruptcy court also reasoned that the right to terminate and liquidate a swap

agreement under Section 560 is divorced from the actual payment of money—that the safe

harbor does not protect the right to pay out collateral as contractually agreed in order to settle

and exit the terminated transactions. That extraordinary conclusion flies in the face of Section 560's express protections for the "liquidation" of swap agreements, and would fundamentally undermine the purpose of the safe harbor. Indeed, Congress amended the Bankruptcy Code in 2005 to make absolutely clear that Section 560, which previously afforded express protection for only the "termination" of a swap agreement, also protects contractual rights to cause the "liquidation" of the swap agreement. Construing Section 560 to permit termination, but to exclude the consequent exercise of contractual rights to calculate and collect payment amounts in respect of the terminated swap agreement—*i.e.*, to liquidate the agreement—would vitiate the protections Congress unequivocally meant to provide. Likewise, the bankruptcy court's misguided suggestion that the safe-harbored right to terminate and liquidate swap agreements does not include the exercise of contractual rights that purportedly "alter" the debtor's rights would erroneously apply to swap agreements the very *ipso facto* restrictions that Section 560 expressly eliminates.

Finally, even if the safe harbor did not protect the enforcement of *ipso facto* clauses to terminate and liquidate swap agreements (and it does), the bankruptcy court also erred in ruling that the Bankruptcy Code invalidates *ipso facto* clauses triggered by the bankruptcy of the debtor's affiliates or guarantors, a standard provision widely relied on in derivatives transactions.

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

ISDA is the global trade association representing leading participants in the derivatives industry. Since its inception, ISDA has pioneered efforts to identify and reduce the sources of risk in the derivatives and risk management business. ISDA was chartered in 1985, and comprises more than 830 member institutions from 57 countries on six continents. These members include most of the world's major institutions dealing in privately negotiated derivatives, as well as many of the businesses, governmental entities, and other end users that

- 3 -

rely on over-the-counter derivatives to manage the market risks inherent in their economic activities. ISDA publishes the ISDA Master Agreement, which is the contractual foundation for more than 90% of derivatives transactions globally (including the transactions at issue here), and distributes market-specific definitional booklets that supplement the Master Agreement.

Because of its role in the development of derivatives markets, ISDA is uniquely well-positioned to address the interpretation of the safe harbor provision in the Bankruptcy Code. Indeed, ISDA actively participated in the enactment of the 1990 amendments to the Bankruptcy Code through which Section 560 and other safe-harbor provisions were adopted.

## STATUTORY BACKGROUND

In order to promote the rehabilitation of the debtor, the Bankruptcy Code permits the debtor to assume most classes of executory contracts and compel the counterparty to perform, provided the debtor affords the counterparty the benefit of its bargain by curing any defaults and providing adequate assurance of future performance. *See* 11 U.S.C. § 365(a), (b)(1). In furtherance of this policy, Section 365(e)(1) of the Bankruptcy Code invalidates contractual provisions that terminate or modify the debtor's rights under the contract solely because of its bankruptcy—so-called *ipso facto* clauses. *See id.* § 365(e)(1). This general invalidation of *ipso facto* clauses does not apply, however, with respect to those classes of contracts that Congress has determined should not be subject to assumption and compelled performance. *See, e.g., id.* § 365(e)(2) (bar against *ipso facto* clauses does not apply to non-assumable contracts for personal services and contracts to extend financial accommodations to the debtor).

Among these excepted classes of contracts are financial contracts. Congress has recognized that the operation of the Bankruptcy Code's *ipso facto* restrictions and other provisions could destabilize the financial markets if those provisions prevented parties to financial contracts, including swap agreements, from exercising their contractual rights upon a

- 4 -

counterparty's bankruptcy filing.  It has therefore enacted various "safe harbors" in the

Bankruptcy Code to exempt the financial markets from these provisions, so that no single

bankruptcy disrupts the functioning of the financial markets.

> U.S. bankruptcy law has long accorded special treatment to transactions involving
> financial markets, to minimize volatility.  Because financial markets can change
> significantly in a matter of days, or even hours, a non-bankrupt party to ongoing
> securities and other financial transactions could face heavy losses unless the
> transactions are resolved promptly and with finality.

H.R. Rep. No. 101-484, at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224.  In the past 30

years, "[a]s new financial instruments have been developed, Congress has amended the 1978

Bankruptcy Code to keep pace in promoting speed and certainty in resolving complex financial

transactions." *Id.*

As early as 1982, Congress amended the Bankruptcy Code to add safe-harbor provisions

exempting payments made in the securities, commodities, and forward contract trades from the

bankruptcy avoidance powers (except in cases of actual fraud) and providing that rights to cause

the "liquidation" of such contracts because of the debtor's bankruptcy cannot be "stayed,

avoided, or otherwise limited by operation of any provision of this title." *See* 1982 Amendments

to Bankruptcy Code, Pub. L. No. 97-222, 96 Stat. 235 (now codified, as amended, at 11 U.S.C.

§§ 362(b)(6), 546(e), 555, 556); H.R. Rep. No. 97-420 (1982), *reprinted in* 1982 U.S.C.C.A.N.

583.  Following a judicial decision that injected uncertainty as to the enforceability of repurchase

agreements in bankruptcy, *see* S. Rep. No. 98-65, at 47 (1983), Congress acted again in 1984 to

clarify that the Bankruptcy Code's safe-harbor protections extended to repurchase agreements.

*See* 1984 Amendments to Bankruptcy Code, Pub. L. No. 98-353, §§ 391-396, 98 Stat. 333 (now

codified, as amended, at 11 U.S.C. §§ 362(b)(7), 546(f), 559); S. Rep. No. 98-65 (1983).

On both occasions, Congress sought to insulate the financial markets from the "ripple effect" that could result if a bankruptcy prevented counterparties to financial contracts from enforcing their rights upon default. *See, e.g., In re Enron Creditors Recovery Corp.*, 422 B.R. 423, 429 (S.D.N.Y. 2009) (McMahon, J.) ("Congress opined that the safe harbor would prevent 'the insolvency of one commodity or security firm from spreading to other firms,' which could otherwise 'threaten the collapse of the affected industry.'" (quoting H.R. Rep. No. 97-420, at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583)).

In 1990, Congress extended safe-harbor protections to swap agreements. In the 1980s, over-the-counter derivatives products, or "swaps," were developed by the financial markets as a way to hedge or reduce various kinds of risk in a particular business.

> A "swap" is a contract between two parties ("counterparties") to exchange ("swap") cash flows at specified intervals, calculated by reference to an index. Parties can swap payments based on a number of indices including interest rates, currency rates and security or commodity prices.

*Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1042 (9th Cir. 2003). Even at that time, in the swap market's infancy, Congress recognized that swap agreements "are a rapidly growing and vital risk management tool in world financial markets," allowing financial institutions, corporations, and governments "to minimize exposure to adverse changes in interest and currency exchange rates." S. Rep. No. 101-285 (1990), *available at* 1990 WL 259288, at *2; *accord* H.R. Rep. 101-484, at 2-3 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224-225. In the following twenty years, the swap markets have only increased in size, complexity, and importance, growing from an estimated $1 trillion notional value of outstanding swaps transactions in 1989 to $426 trillion in 2009. *Interest Swap: Hearing on S. 396 Before the Subcommittee on Courts and Administrative Practices of the Senate Committee on the Judiciary,*

101st Cong. 14 (1989); ISDA Market Survey, *available at* http://www.ISDA.org/statistics/
pdf/ISDA-Market-Survey-annual-data.pdf.

Echoing the concerns that drove Congress to act in 1982 and 1984, Congress was
concerned about "volatility in the swap agreement markets resulting from the uncertainty over
their treatment in the Bankruptcy Code." H.R. Rep. No. 101-484, at 3 (1990), *reprinted in* 1990
U.S.C.C.A.N. 223, 225. As Senator Heflin explained, "[t]here is concern that if one of the
parties to a swap agreement files for bankruptcy under the current Bankruptcy Code, the non-
defaulting party is left with a substantial risk and, depending on the size of the swap agreement,
could cause a rippling effect which would undermine the stability of the financial markets."
*Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Administrative Practices
of the Senate Comm. on the Judiciary*, 101st Cong. 1 (1989).

Accordingly, Congress enacted the 1990 Amendments to the Bankruptcy Code, which
were designed to provide certainty to the over-the-counter derivatives markets by protecting
swap transactions from the effects of bankruptcy. *See* 1990 Bankruptcy Amendments, Pub. L.
No. 101-311, 104 Stat. 267; *see also* S. Rep. No. 101-285, at 1 (1990), *available at* 1990 WL
259288, at *1 (the purpose of the bill is "to clarify U.S. bankruptcy law with respect to the
treatment of swap agreements and forward contracts. The bill would provide certainty for swap
transactions in the case of a default in bankruptcy....").

The addition of Section 560 to the Bankruptcy Code was a key element of this safe-
harbor protection. *See* 1990 Bankruptcy Amendments, Pub. L. No. 101-311, § 106, 104 Stat.
267. Section 560 was intended "to preserve a swap participant's contractual right to terminate a
swap agreement and offset any amounts owed under it in the event that one of the parties to the
agreement files a bankruptcy petition." *See* H.R. Rep. No. 101-484, at 5 (1990), *reprinted in*

1990 U.S.C.C.A.N. 223, 227.  Through enactment of this safe harbor, Congress made clear that "the exercise of any such right shall not be … limited by operation of the Bankruptcy Code." *Id.* In other words, Section 560 "means that these contractual rights are not to be interfered with by any court proceeding under the [Bankruptcy] Code." S. Rep. No. 101-285 (1990), *available at* 1990 WL 259288, at \*9; *see also* 136 Cong. Rec. 13,153 (1990) (statement of Sen. DeConcini) ("The effect of the swap provisions will be to provide certainty for swap transactions and thereby stabilize domestic markets by allowing the terms of the swap agreement to apply notwithstanding the bankruptcy filing.").

Congress amended the Bankruptcy Code again in 2005, acting on recommendations of the President's Working Group on Financial Markets.  *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 907(j), 119 Stat. 23; H.R. Rep. No. 109-31, at 20 & n.79 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 105.  Significantly, two amendments are particularly pertinent to the issues before the Court.  First, it significantly expanded the statutory definition of "swap agreement" to include "any security agreement or arrangement or other credit enhancement related to" a swap agreement.  *See* 11 U.S.C. § 101(53B)(A)(vi).  "This ensures that any such agreement, arrangement or enhancement is itself deemed to be a swap agreement, and therefore eligible for treatment as such for purposes of termination, liquidation, acceleration, offset and netting under the Bankruptcy Code." *See* H.R. Rep. No. 109-31, at 107 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 190.  Second, it also amended Section 560 to "clarify that the provisions of the Bankruptcy Code that protect … rights to terminate under swap agreements also protect rights of liquidation and acceleration," by replacing the phrase "termination of a swap agreement" with the "*liquidation*, termination, or acceleration of one or more swap agreements." *Id.* at 193, 224 (emphasis added).

- 8 -

As with the earlier amendments, Congress emphasized that the 2005 amendments were "intended to reduce 'systemic risk' in the banking system and financial marketplace," *i.e.*, "the risk that the failure of a firm or disruption of a market or settlement system will cause widespread difficulties at other firms, in other market segments or in the financial system as a whole." H.R. Rep. No. 109-31, at 20 & n.78 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 105-06. *Id.* at 20 n.78. Thus, "[f]or purposes of ... section[] 560, ... it is intended that the normal business practice in the event of a default of a party based on bankruptcy or insolvency is to terminate, liquidate or accelerate ... swap agreements ... with the bankrupt or insolvent party." *Id.* at 133.

In 2006, Congress enacted the Financial Netting Improvements Act.  Among other provisions, the Act amended the safe-harbor protections for swap agreements in Section 362(b)(17) to make clear that they "protect, free from the automatic stay, ... self-help foreclosure-on-collateral rights, setoff rights and netting rights." *See* H.R. Rep. No. 109-648 (2006), *available at* 2006 WL 6165926, at *7; Financial Netting Improvements Act of 2006, Pub. L. No. 109-390, § 5, 120 Stat. 2692, 2697 (codified at 11 U.S.C. § 362(b)(17)).  These revisions were intended to "strengthen[] and clarify[] the enforceability of early termination and close-out netting provisions and related collateral arrangements in U.S. insolvency proceedings," in order to "reduce systemic risk in the financial markets." H.R. Rep. No. 109-648 (2006), *available at* 2006 WL 6165926, at *1-2.

As courts have recognized, the safe harbor provisions thus reflect a strong Congressional policy of safeguarding the financial markets from the disruptive effects of a counterparty's bankruptcy filing. *See, e.g.*, *In re Nat'l Gas Distribs.*, 556 F.3d 247, 259 (4th Cir. 2009) (swap safe harbors serve a "policy of protecting financial markets and therefore favoring an entire class

of instruments and participants"); *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322

F.3d 1039, 1050 (9th Cir. 2003) ("The legislative history of the Swap Amendments plainly

reveals that Congress recognized the growing importance of interest rate swaps and sought to

immunize the swap market from the legal risks of bankruptcy."). Accordingly, consistent with

their history and purpose, the safe harbor provisions should be construed in accordance with their

plain meaning to uphold the broad protections that Congress intended to provide for the financial

markets.

## ARGUMENT

**I.  THE BANKRUPTCY CODE'S SAFE HARBOR PROTECTS ANY "SWAP AGREEMENT," INCLUDING ALL CONDITIONS INCORPORATED BY REFERENCE AND RELATED SECURITY ARRANGEMENTS.**

The bankruptcy court's decision threatens to undermine the safe-harbor protections for

the  swaps and derivatives markets by dramatically narrowing the scope of transactions that

qualify as a protected "swap agreement."  Under its erroneous approach, parties must set forth

their entire agreement within the four corners of a single document for it to qualify as a "swap

agreement."  Applying that rationale, the bankruptcy court concluded that the Noteholder

Priority provision is not part of a "swap agreement" because it could find "no reference" to that

provision in "the components of each Swap Agreement—the ISDA Master Agreement,

schedules and written confirmation." *In re Lehman Bros. Holdings Inc.*, 422 B.R. 407, 421

(S.D.N.Y. 2010).

Contrary to the bankruptcy court's narrow reading, Congress made clear in defining

"swap agreement" that parties need not set out their entire agreement in one document.  A "swap

agreement" includes "any agreement" that is a swap (broadly defined), "*including the terms and

conditions incorporated by reference in such agreement.*" *See* 11 U.S.C. § 101(53B)(A)(i)

(emphasis added); *id.* § 101(53B)(A)(ii)(I).  A "swap agreement" also includes "a master

- 10 -

agreement … together with all supplements." *Id* § 101(53B)(A)(v).  Finally, Congress made

clear that a "swap agreement" includes "any combination of agreements or transactions referred

to in" the definition of "swap agreement."  *Id.* § 101(53B)(A)(iii).

Congress defined "swap agreement" broadly in recognition of market practice.  Swap

transactions are complex and often documented in a series of agreement documents, schedules,

supplements, and additional terms and conditions incorporated by reference.  Since its inception,

ISDA has been actively involved in the development of standard documentation for swap and

derivatives transactions, recognizing the efficiency gains to be achieved if market participants do

not have to negotiate and document each transaction in a separate, comprehensive agreement.

Thus, ISDA has published several versions of a Master Agreement, which allows parties

to agree on the terms and conditions of their ongoing legal and credit relationship (covering such

matters as representations, events of default, and termination), governing each transaction

between them.  The parties may amend and supplement the terms of the ISDA Master

Agreement (which is itself a printed form) through one or more schedules to the Master

Agreement.  Then, each time the parties enter into a transaction, they need only negotiate and

document the economic terms of the transaction, set forth in yet another document, a written

confirmation.  In keeping with this "modular architecture," the confirmation incorporates the

terms and conditions of the Master Agreement and related schedules and is stated to be a

supplement to, and part of, that agreement (along with each other transaction entered into in

reliance on the Master Agreement).  The confirmation may also incorporate additional terms and

conditions, by reference to one or more ISDA booklets of "Definitions," which contain standard

definitional and operational terms for documenting a particular type of transaction.

- 11 -

The bankruptcy court's decision is thus markedly at odds with the statute and the market. As BNY explains (BNY Br. at 31-32), the Noteholder Priority provision was incorporated by reference in the Schedule to the ISDA Master Agreement at issue, and thus is part of a "swap agreement" as "terms and conditions incorporated by reference in such agreement." *See* 11 U.S.C. § 101(53B)(A)(i), (ii); ISDA Schedule ¶ 5(g) (providing that the "terms of [the] Trust Deed prevail to the extent they conflict with terms relating to [the swap] Transaction"; Lehman's "recourse ... is limited to ... the Security ... as provided in the Trust Deed"; and "no debt shall be owed by [the counterparty] ... after realisation of the Security and application of the proceeds in accordance with the Trust Deed"), D.E. 6, Lee Decl. Ex. E.

In ruling to the contrary, the bankruptcy court opined that there was "no reference at all to ... the Noteholder Priority provision" in the ISDA Master Agreement, Schedule and Confirmation. *See* 422 B.R. at 421. While the court may have simply overlooked the relevant provisions of the Schedule, the more worrying implication is that it misconstrued the term "incorporated by reference" in the Bankruptcy Code definition of "swap agreement" to mean only terms and conditions that are literally stated (*i.e.*, "Noteholder Priority provision") rather than those that are incorporated, "by reference," to another document that contains those terms and conditions (*i.e.*, "Trust Deed"). Such a construction would upset commercial expectations and substantially reduce the efficiencies that ISDA's documentation architecture is designed to provide.

Moreover, even if the Noteholder Priority provision had not otherwise been incorporated by reference, the bankruptcy court erred by failing to recognize that it was part of a "swap agreement" as a term contained in a security agreement related to the swap agreements at issue in the Dante transactions. As noted, Congress amended the definition of "swap agreement" in 2005

- 12 -

to include "any security agreement or arrangement or other credit enhancement related to any" swap agreement. *See* 11 U.S.C. § 101(53B)(A)(vi). It recognized that a security agreement is a key term of any swap agreement, affecting the credit risk and overall economic value of the transaction to the parties, and thus sought to "ensure[] that any such agreement ... is itself deemed to be a swap agreement ... for purposes of termination, liquidation, acceleration, offset and netting." *See* H.R. Rep. No. 109-31, at 107 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 190.

The bankruptcy court thus erred in limiting its review to the ISDA Master Agreement, Schedule and Confirmation. Those are not the exclusive components of a "swap agreement," and the express language of the Bankruptcy Code required the bankruptcy court to examine any related security arrangements. The Supplemental Trust Deed is, by its terms, just such an arrangement. *See* Supplemental Trust Deed ¶ 5.3 (providing "security ... for the performance of the Issuer's obligations (if any) under the Swap Agreement"), D.E. 6, Lee Decl. Ex. D; *cf.* 5 *Collier on Bankruptcy* ¶ 560.02, at 560-6 n.2 (16th ed. 2010) ("The *Lehman* decision [on appeal here] is questionable because the priority-shifting provisions were contained in the security arrangement for the subject swap agreement and, thus, were a swap agreement under Bankruptcy Code section 101(53B)(A)(vi).").

This aspect of the bankruptcy court's decision also has broader concern for the market. Parties to swap agreements frequently rely on collateral or other security arrangements to reduce their exposure to a counterparty's credit risk. ISDA publishes several different versions of a Credit Support Annex, by which parties may document such security arrangements. The Credit Support Annex is set forth in a separate document from the Master Agreement, related schedule and confirmation to which the bankruptcy court limited its review (although the Credit Support Annex provides that it "supplements, forms part of, and is subject to, the [Master] Agreement, is

- 13 -

part of its Schedule and is a Credit Support Document under this [Master] Agreement"). *See* 1994 Credit Support Annex (preamble).

Although separately documented, such security arrangements are critical components of swap transactions, and market participants enter into them in reliance on the safe-harbor protections for such arrangements. By creating uncertainty about the protection for such arrangements, the bankruptcy court's decision undermines Congressional intent to shelter such collateral arrangements from bankruptcy-law restrictions, which it determined was necessary to protect the liquidity and stability of financial markets. *Cf. Enron*, 422 B.R. at 429, 436 (noting that section 546(e) safe harbor from avoidance for securities contracts, which "was designed to ensure settlement finality, and therefore market stability," has been held to protect "the return of a [counterparty's] collateral" upon termination of the transaction (citing *In re Comark*, 971 F.2d 322 (9th Cir. 1992))).

## II.    THE BANKRUPTCY CODE'S SAFE HARBOR PROTECTS THE RIGHT TO ENFORCE *IPSO FACTO* CLAUSES TO TERMINATE AND LIQUIDATE SWAP AGREEMENTS IN ACCORDANCE WITH CONTRACTUAL TERMS.

The bankruptcy court's decision threatens to undermine the safe-harbor protections for the swaps and derivatives markets in a second, and equally fundamental, way. Although section 560 protects the contractual rights of counterparties to terminate and liquidate swap agreements upon the debtor's bankruptcy, the bankruptcy court suggested that this right does not include the right to enforce contractual provisions, like the Noteholder Priority provision at issue here, that "dictate the means by which the proceeds of each Swap Agreement will be distributed." *See Lehman*, 422 B.R. at 421. In essence, the bankruptcy court posited that the safe harbor protects the right to terminate a swap agreement, but not the right to effect actual payment as a result. The consequent inability to resolve defaulted swap transactions with a bankrupt counterparty raises the very danger of systemic risk to the financial markets that Congress sought to prevent.

- 14 -

Furthermore, the bankruptcy court's suggestion that the safe harbor does not protect the exercise of any contractual rights that purportedly "alter" the debtor's pre-existing rights, *see id.*, would erroneously re-impose the Bankruptcy Code's *ipso facto* restrictions that the safe harbor for swap agreements was intended to remove.

### A.    The Right to Liquidate a Swap Agreement Includes Determining and Effecting Payment in Settlement of the Terminated Transaction.

Section 560 provides that:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title [*i.e.*, bankruptcy or insolvency] or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 560.  Thus, if a counterparty has the right under a swap agreement to liquidate, terminate or accelerate the agreement because of the debtor's bankruptcy filing, Section 560 permits the counterparty—free from all restrictions under bankruptcy law—to "exercise ... any contractual right ... to cause the liquidation, termination, or acceleration" of the swap agreement.

Accordingly, a straightforward application of the safe harbor permits counterparties to exercise their rights under any contractual provision governing the "termination" or "liquidation" of a swap agreement, including provisions, like the Noteholder Priority provision, that "dictate the means by which the proceeds of each Swap Agreement will be distributed." 422 B.R. at 421. The bankruptcy court's suggestion that the "liquidation" of a swap agreement does not include the process of determining what will actually be paid to resolve it is simply not consistent with the text or purpose of Section 560.

The Bankruptcy Code, like any statute, must be construed in accordance with its plain meaning. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989).  Although not

- 15 -

defined in the Bankruptcy Code, the plain meaning of "liquidation" is to reduce to money—to determine and effect a final pay out in settlement of the terminated contract. *Cf. Perrin v. United States*, 444 U.S. 37, 42 (1979) ("[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). This is the standard textbook definition of "liquidation." *See* Black's Law Dictionary 950 (9th ed. 2009) (defining "liquidation" to mean "[t]he act of determining by agreement or by litigation the exact amount of something (as a debt or damages)"; "[t]he act of settling a debt by payment or other satisfaction"; and "[t]he act or process of converting assets into cash, esp[ecially] to settle debts.").

In order to "liquidate" a swap agreement, counterparties must of necessity enforce all of the contractual provisions that prescribe the methodology for calculating final payment amounts and applying any collateral or other credit support. Exercising rights under a provision, like the Noteholder Priority provision, that determines how collateral will be paid out upon termination of the transaction is thus an obvious and important part of liquidating a swap agreement.

The text of Section 560 makes clear that this is precisely what Congress intended. Section 560 authorizes counterparties to offset or net out any "termination values" or "payment amounts" *"arising ...* in connection with the termination, liquidation, or acceleration" of a swap agreement. *See* 11 U.S.C. § 560 (emphasis added). The protected right to terminate and liquidate a swap agreement therefore necessarily includes the right to enforce the contractual provisions by which the counterparty determines the final "termination values" and "payment amounts" that will "aris[e]" as a result.

That process likewise includes the determination of "payment amounts" to be made from any collateral securing the swap transactions. Because the Bankruptcy Code defines "swap agreement" to include any "related" "security agreement or arrangement," *see id.* §

101(53B)(A)(vi), the protected right to cause the "liquidation" of a "swap agreement" includes the right to "liquidat[e]" a "security agreement or arrangement" related to the swap agreement. The "liquidation" of a security agreement or arrangement, in turn, entails the contractual process of determining and collecting the actual "payment amounts" from the collateral (or proceeds) "arising ... in connection with the termination[] [or] liquidation" of the swap agreement and related security arrangements. *See id.* § 560. Indeed, that process is necessarily entailed in the exercise of self-help remedies against collateral, which Congress unequivocally intended to protect. *See id.* § 362(b)(17), (o) (providing that swap participants shall not be stayed from "exercis[ing] ... any contractual right (as defined in Section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or ... to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with" a swap agreement).

This meaning of "liquidation" is reinforced by Congress's use of that term in other provisions of the Bankruptcy Code. *See Cohen v. De La Cruz*, 523 U.S. 213, 220 (1998) (construing Bankruptcy Code in accordance with "the presumption that equivalent words have equivalent meaning when repeated in the same statute"). In a provision on which Section 560 was modeled—*see* S. Rep. No. 101-285 (1990), *available at* 1990 WL 259288, at *9; H.R. Rep. No. 109-31 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, at 193—Section 559 of the Bankruptcy Code provides a virtually identical safe harbor for repurchase agreements, protecting the "exercise of a contractual right of a repo participant ... to cause the liquidation, termination, or acceleration of a repurchase agreement" if the debtor becomes bankrupt. *See* 11 U.S.C. § 559. Section 559 further provides that

> "In the event that a repo participant ... *liquidates* one or more repurchase agreements ... and under the terms of one or more such agreements has agreed to

- 17 -

> deliver assets subject to repurchase agreements to the debtor, any excess of the
> market price received on *liquidation of such assets* … over the sum of the stated
> repurchase prices and all expenses in connection with the liquidation of such
> repurchase agreements shall be deemed property of the estate, subject to the
> available rights of setoff."

*Id.* (emphasis added).  Section 559 thus provides that the "liquidation" of a repurchase agreement

may include the "liquidation of … assets" subject to that agreement—essentially the collateral

securing the counterparty's repo financing of the debtor—and the application of the proceeds in

satisfaction of the counterparty's contractual rights (with any excess proceeds payable to the

debtor).  *See In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d 742, 744, 748-49,

753 (3d Cir. 1989) (Section 559 permits repo participant to "liquidate its securities" and "keep

the proceeds … to the extent of its contract price").  Accordingly, Section 559 makes clear that

Congress understood "liquidation" to include the payment of contractually determined amounts

upon termination of the transaction.

    That same fundamental meaning of "liquidation" is likewise reflected in the

corresponding safe harbor for the "liquidation" of securities contracts.  *See* 11 U.S.C. § 555; *In*

*re Residential Res. Mortg. Invs. Corp.*, 98 B.R. 2, 23-24 (Bankr. D. Ariz. 1989) (Section 555

protects right "to liquidate immediately the underlying securities"); *In re Am. Home Mortg.*

*Holdings, Inc.*, 388 B.R. 69, 87-88 (Bankr. D. Del. 2008) (Sections 555 and 559 protected

Lehman Brothers' "foreclosing on and/or liquidating the Subordinated Notes" underlying

repurchase agreement and securities contract).

    Indeed, "liquidation" is used repeatedly throughout the Bankruptcy Code to refer to the

process of reducing a liability or asset to money for payment in settlement of claims.  *See, e.g.*,

11 U.S.C. § 741(6)(A)(i) (defining "net equity" claim of stockbroker customer as the "aggregate

dollar balance that would remain … after the liquidation, by sale or purchase … of all securities

positions"); *id.* § 752(c) (allocating "[a]ny cash or security remaining after the liquidation of a

- 18 -

security interest created under a security agreement made by the debtor"); *id.* § 1174 (entitled "Liquidation," directing trustee in failed railroad reorganization "to collect and reduce to money all of the property of the estate"). Even more broadly, an entire chapter (7) of the Bankruptcy Code—entitled "Liquidation"—establishes a process by which a trustee "collect[s] and reduce[s] to money the property of the estate," *id.* § 704(a)(1); reviews and objects to improper claims, *id.* § 704(a)(5); and makes a final "distribut[ion]" of property of the estate "in payment of claims" in accordance with their allowed amounts and priorities, *id.* § 726.

The plain meaning of "liquidation" in the text of Section 560 is further reinforced by its history and purpose. As discussed above, Congress recognized that the swaps and derivatives markets, like other financial markets, are volatile and marked by a high degree of interrelation among market participants. It enacted the safe harbor protections in response to concerns that a market participant's bankruptcy could have a cascading impact on the liquidity or solvency of other market participants and the stability of financial markets "unless the transactions are *resolved promptly and with finality*." *See* H.R. Rep. No. 101-484, at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224 (emphasis added). To address those concerns, Congress enacted the safe harbors to exempt swap participants from the Bankruptcy Code's restrictions on the exercise of their contractual rights, allowing a counterparty to cause the "immediate termination and netting" of all transactions, to "determine, ... upon default, which party is owed how much," and to "cause the liquidation of any collateral it holds." S. Rep. No. 101-285 (1990), *available at* 1990 WL 259288, at *3, *8. These protections were enacted precisely so that the unwinding of swap transactions and related collateral would not be tied up in the bankruptcy courts. A narrow construction of "liquidation" that leads to that very result is simply not tenable.

Accordingly, the bankruptcy court's conclusion that the "liquidation" of a swap agreement does not include the enforcement of contractual provisions governing how collateral will be paid out to settle the contract is a deeply flawed reading of the statute. It is also troubling for the broader market. Although the Dante transactions were complex, the Noteholder Priority provision's basic function—to prescribe the rules for distributing collateral in the event of a default and early termination of the swap agreement—is similar to that of provisions that are commonplace in a wide range of more traditional derivatives transactions, such as interest-rate and foreign-currency swaps. The ISDA Credit Support Annex, widely used by market participants, includes standard provisions addressing this very contingency. *See* 1994 Credit Support Annex (New York law) ¶ 8(a)-(b). The enforcement of such rights is critical to the ability of counterparties (and the market as a whole) to minimize exposure to economic loss and to preserve liquidity in the event a market participant becomes bankrupt. And in circumstances like those present here—where the parties' non-bankruptcy rights are governed by foreign law— the safe harbor further serves important interests of comity and respect for foreign judgments. By introducing uncertainty regarding the enforceability of such provisions, the bankruptcy court's decision disregards these important congressional purposes, and risks imposing the very market turmoil that Congress sought to avoid.

**B.     The Safe Harbor Protects Contractual Provisions Providing For The "Alteration" of the Debtor's Rights By Virtue of The Bankruptcy.**

The bankruptcy court committed further error by stating that the scope of the protected right to terminate and liquidate a swap agreement under Section 560 does not include the right to enforce any contractual provision that involves "the alteration of rights as they then exist." *Lehman*, 422 B.R. at 421. That is a serious misreading of Section 560.

- 20 -

Section 560 provides that the exercise of a swap party's contractual rights to terminate and liquidate a swap agreement because of the debtor's bankruptcy "shall not be ... limited by operation of *any* provision" of the Bankruptcy Code. *See* 11 U.S.C. § 560 (emphasis added). The "provision[s]" of the Bankruptcy Code include Section 365(e)(1) of the Bankruptcy Code, which invalidates *ipso facto* clauses providing for the termination or "modification"—or in the bankruptcy court's words, "alteration"—of the debtor's rights. *See id.* § 365(e)(1). Thus, Section 560 provides a safe harbor for swap participants to exercise their contractual rights of termination and liquidation, without limitation from any provisions of the Bankruptcy Code that would otherwise invalidate *ipso facto* "modifications" or "alterations" of the debtor's rights. Indeed, by expressly authorizing swap participants to exercise such rights "because of a condition of the kind specified in section 365(e)(1)," Congress unquestionably intended to override any restrictions in Section 365(e)(1) that would otherwise bar the exercise of such rights because of such a condition. Contrary to the bankruptcy court's suggestion, therefore, whether a contractual provision purportedly involves an "alteration" of the debtor's pre-existing rights is simply not part of the safe-harbor analysis. If the contractual provision at issue involves the "liquidation, termination, or acceleration" of the swap agreement, it is protected, period.

Again, the bankruptcy court's decision has worrying implications for the broader market. Its decision could create uncertainty as to whether counterparties could exercise their contractual rights of liquidation, beyond mere termination, or whether doing so would purportedly run afoul of the Bankruptcy Code's bar against *ipso facto* "modifications" of the debtor's rights, notwithstanding the express exemption from such bankruptcy-law restrictions under Section 560.

The potential consequences could be far reaching. The bankruptcy court's implication in this case—that the Noteholder Priority provision impermissibly "altered" the debtor's rights

because of its bankruptcy—could potentially be asserted with respect to a host of standard
contractual provisions commonly relied on by participants in the derivatives markets.  Under the
bankruptcy court's notion, a debtor can *always* assert that *any* right a counterparty seeks to
exercise under Section 560 is "because of" the debtor's bankruptcy, since, by definition, the
debtor's bankruptcy is precisely the event of default Congress expressly authorized
counterparties to invoke.  Thus, a debtor employing the bankruptcy court's rationale could
always argue that any such right is an unenforceable *ipso facto* clause if it purportedly "alters"
the debtor's pre-existing rights.

     For example, the ISDA Master Agreement provides that if an early termination of the
swap agreement results from an event of default—whether for bankruptcy or for any other
reason—the parties' on-going payment obligations are terminated and replaced with a payment
obligation determined in accordance with the contract's termination provisions.  *See* 2002 Master
Agreement ¶¶ 5(a), 6(a), (c)(ii), (e); *accord* 1992 Master Agreement.  Unlike many commercial
agreements, ISDA derivative agreements commonly provide that the party that is "in the money"
with respect to the transaction may be entitled to recover under the agreement, even if the
agreement terminates on account of that party's default.  At the same time it does that, however,
the agreement typically sets forth detailed provisions governing the manner in which the
termination payment is calculated that apply in the event of bankruptcy.  *See id.* ¶ 6(e)(i).  Under
the "market quotation" payment measure in the 1992 Master Agreement, the non-defaulting
party determines a payment amount based on quotations from other market participants (selected
by the non-defaulting party) to enter into replacement transactions.  *See id.* ¶ 14.  Under the
alternative "loss" methodology, the non-defaulting party determines a payment amount based on
its good-faith calculation of its losses (or gains), which may, but need not, be determined by

reference to market quotations. *See id.* Under the "close-out" measure in the 2002 Master Agreement, the non-defaulting party determines such payment amount based on its good faith calculation of the losses (or gains) that are or would be incurred in replacing the terminated transactions, which may be based on quotations, relevant market data, or internal sources. *See* 2002 Master Agreement ¶ 14.

It is readily apparent that the resulting termination value calculated by the non-defaulting party may differ from the value that the debtor (or its creditors in bankruptcy) perceived the contract to have before it was terminated. Under the bankruptcy court's reading of the safe harbor, debtors could potentially challenge the enforceability of such calculations under the Bankruptcy Code's *ipso facto* prohibitions, on grounds that they adversely "alter" or "modify" the debtor's rights, or its economic interests in the swap agreement. That approach could transform virtually any dispute over valuation into a potential *ipso facto* challenge. Given the obvious potential for disputes over valuation of swap agreements—which derive their value from volatile financial-market references—the impact on derivatives markets could be substantial. The ability to close out and liquidate even the most basic interest-rate swap agreement in the event of a bankruptcy could be questioned.

The basic ISDA architecture—all written against the backdrop of the bankruptcy safe harbor provisions—depends on the enforceability of the agreement as written, including provisions triggered by the debtor's bankruptcy. Permitting a party whose bankruptcy was itself a default under the agreement to recover under the contract, while at the same time disregarding the calculation mechanism that was intended to apply in the event of bankruptcy, would make no commercial sense, and would turn the basic documentation on which most derivatives agreements are structured on its head.

The central reasons that ISDA developed standard termination provisions as part of its documentation architecture were to avoid disputes or litigation over valuation and to facilitate agreement upon a methodology for resolving defaulted transactions with efficiency and finality. If debtors could now set aside such contractual provisions in bankruptcy, the contractual foundations underpinning substantial portions of the derivatives markets could be upended. At a minimum, such an approach would invite litigation and delay before the safe harbor could be relied on, fundamentally undermining the certainty and market-protection objectives the safe harbor was designed to provide.

In short, the bankruptcy court's decision is contrary to the express terms of Section 560 and is damaging to the market-protection policies the safe harbor was designed to promote. The Court should reject the bankruptcy court's erroneous reading of the safe-harbor provisions.

## III.   THE BANKRUPTCY CODE DOES NOT INVALIDATE *IPSO FACTO* CLAUSES TRIGGERED BY THE BANKRUPTCY OF A THIRD PARTY.

Even if the safe harbor did not protect the enforcement of *ipso facto* clauses to terminate and liquidate swap agreements—and it does—the bankruptcy court erred in construing Sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code to invalidate *ipso facto* clauses triggered by the bankruptcy of a party other than the debtor itself. For the reasons set forth in BNY's brief, the Bankruptcy Code invalidates *ipso facto* clauses triggered by the *debtor's* bankruptcy, not the bankruptcy of a third party, like LBHI here. (BNY Br. at 18-28.)

As the bankruptcy court acknowledged, its ruling is unprecedented. If the Bankruptcy Code were construed to invalidate *ipso facto* clauses triggered by affiliates or guarantors of the debtor—and if such *ipso facto* prohibitions were erroneously applied to swap agreements notwithstanding the safe harbor—the impact on derivatives markets could be significant.

- 24 -

As a credit enhancement, parties frequently enter into swap agreements in reliance on guarantees or other express or implicit assurances from a parent corporation or other affiliate of the counterparty.  Under the ISDA Master Agreement, the bankruptcy or insolvency of any third-party "Credit Support Provider" or other "Specified Entity" identified in the schedule constitutes a standard event of default, entitling the counterparty to terminate the swap agreement.  *See* 1992 Master Agreement ¶ 5(a)(vii).  A party relying on the credit of a guarantor or affiliate may thus terminate the transactions if that entity becomes insolvent.

The bankruptcy court's decision, however, substantially undermines the reliance on such corporate guarantees.  A party that terminates a swap agreement because of a guarantor's bankruptcy could face the risk that such termination would be unwound months or years later if the counterparty subsequently becomes bankrupt.  As a result, the party could find itself unexpectedly exposed to the credit risk of the debtor, which the guarantee was intended to mitigate.  The bankruptcy court's decision could thus be detrimental to the operation of derivatives markets, without any basis in the text or policy of the statute to support such a result.

## **CONCLUSION**

For the foregoing reasons, the judgment of the bankruptcy court should be reversed.

- 25 -

Dated:  November 1, 2010

Respectfully submitted,

Craig Goldblatt
Danielle Spinelli (DS 7097)
Joel Millar (JM 9254)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

Philip D. Anker (PA 7833)
Jeannette Boot
WILMER CUTLER PICKERING HALE
    AND DORR LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

Counsel for the International Swaps and Derivatives Association, Inc., *Amicus Curiae*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Lehman Brothers Holdings Inc., *et al.*,<br><br>Debtors. | S.D.N.Y. Bankr. Chapter 11<br>No. 08-13555 (JMP) |
| BNY Corporate Trustee Services Limited,<br><br>Appellant,<br><br>v.<br><br>Lehman Brothers Special Financing, Inc.<br><br>Appellee. | No. M 47 (CM)<br><br>S.D.N.Y. Bankr. Adv. Proc.<br>No. 09-01242 (JMP) |

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of November 2010, a true and correct copy of the Brief of *Amicus Curiae* The International Swaps and Derivatives Association was served via e-mail and first class mail upon the parties listed on the attached Service List.

Dated:  November 1, 2010

Respectfully submitted,

Philip D. Anker (PA-7833)
Craig Goldblatt
Danielle Spinelli (DS 7097)
Joel Millar (JM 9254)
WILMER CUTLER PICKERING HALE
   AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

Jeannette Boot
WILMER CUTLER PICKERING HALE
   AND DORR LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

Counsel for *Amicus Curiae* the International Swaps and Derivatives Association, Inc.

## SERVICE LIST

**Weil, Gotshal & Manges, LLP**
767 Fifth Avenue
New York, NY 10153
Attn:    Ralph I. Miller, Esq.
         Peter Gruenberger, Esq.
Email: ralph.miller@weil.com
       peter.gruenberger@weil.com

*(Counsel to Lehman Brothers Special Financing Inc.)*

**Milbank, Tweed, Hadley & McCloy LLP**
1 Chase Manhattan Plaza
New York, NY 10005
Attn:    Dennis F. Dunne, Esq.
         Evan R. Fleck, Esq.
         David S. Cohen, Esq.
Email: ddunne@milbank.com
       EFleck@milbank.com
       dcohen2@milbank.com

*(Counsel to the Creditors Committee)*

**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, New York 10166
Attn:    Randy M. Mastro, Esq.
         Michael A. Rosenthal, Esq.
         Travis D. Lenkner, Esq.
Email: rmastro@gibsondunn.com
       mrosenthal@gibsondunn.com
       tlenkner@gibsondunn.com

*(Counsel to BNY Corporate Trustee Services Limited)*

**Reed Smith LLP**
599 Lexington Avenue
New York, New York 10022
Attn:    Eric A. Schaffer, Esq.
         Michael J. Venditto, Esq.
Email: eschaffer@reedsmith.com
       mvenditto@reedsmith.com

*(Counsel to BNY Corporate Trustee Services Limited)*