**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| MICHIGAN STATE HOUSING DEVELOPMENT AUTHORITY, a public body corporate, | |
| Plaintiff/Counterclaim Defendant, | Dist. Ct. No. 11 Civ. 03392 (JGK) |
| v. | Bankr. Adv. Proc. No. 09-01728 |
| LEHMAN BROTHERS DERIVATIVE PRODUCTS INC. AND LEHMAN BROTHERS HOLDINGS INC., | |
| Defendants, | |
| - and - | |
| LEHMAN BROTHERS SPECIAL FINANCING INC., | |
| Defendant/Counterclaim Plaintiff | |
| - and - | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Intervening Defendant/ Counterclaim Plaintiff. | |

**LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTEHRS DERIVATIVE PRODUCTS INC. AND LEHMAN BROTHERS SPECIAL FINANCING INC.'S MEMORANDUM OF LAW IN OPPOSITION TO MICHIGAN STATE HOUSING DEVELOPMENT AUTHORITY'S MOTION TO WITHDRAW THE REFERENCE**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 4

    A.    The Operative Agreements Between MSHDA and LBDP.................................. 4

    B.    Assignment of the Transactions From LBDP to LBSF ...................................... 7

    C.    The Ipso Facto Event: LBSF's Bankruptcy Filing and Transformation of the Valuation Measure ...................................................................................... 8

    D.    Procedural History ........................................................................................... 9

ARGUMENT ...................................................................................................... 10

I.    THE LEGAL STANDARD FOR WITHDRAWAL OF THE REFERENCE ................ 10

II.    MSHDA'S MOTION IS PREMATURE BECAUSE THE BANKRUPTCY COURT SHOULD FIRST DETERMINE WHETHER THIS ACTION IS CORE ........ 11

III.    THE ORION FACTORS WEIGH HEAVILY AGAINST WITHDRAWING THE REFERENCE IN THIS CASE .................................................................... 13

    A.    This Action Raises Core Bankruptcy Issues .................................................... 13

    B.    Allowing the Bankruptcy Court to Retain Jurisdiction Over This Action Will Promote Judicial Economy and Efficiency.................................................. 16

    C.    MSHDA's Motion is Nothing More than an Attempt at Forum Shopping ......... 20

    D.    The Remaining Orion Factors Weigh Against Withdrawal Here ....................... 21

IV.    MSHDA'S CONTENTION THAT THIS ACTION PRESENTS "ISSUES OF FIRST IMPRESSION" IS MISGUIDED AND WRONG .............................................. 22

CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.),*
  437 B.R. 88 (S.D.N.Y. 2010) .................................................................15

*Am. Coal Co. v. Enron N. Am. Corp.,*
  No. 03 Civ. 1727, oral decision (S.D.N.Y. June 25, 2003) ....................18

*Amerada Hess Corp. v. Enron Corp. (In re Enron Corp.),*
  No. 03 Civ. 5288, slip op. (S.D.N.Y. Sept. 24, 2004) ...........................17

*Arnold Print Works, Inc. v. Apkin (In re Arnold Print Works, Inc.),*
  815 F.2d 165 (1st Cir. 1987) ..................................................................13

*Ben Cooper, Inc. v. Ins. Co. of the State of Pa. (In re Ben Cooper, Inc.),*
  896 F.2d 1394 (2d Cir.),
  *vacated,* 498 U.S. 964 (1990) .................................................................13

*California v. Enron Corp. (In re Enron Corp.),*
  2005 WL 1185804 (S.D.N.Y. May 18, 2005) ........................................17

*Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.),*
  2009 WL 1578282 (S.D.N.Y. May 7, 2009) ...........................................8

*Camp v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA (In re Gov't Sec. Corp.),*
  111 B.R. 1007 (S.D. Fla. 1990)) ......................................................15, 16

*Cape Cod Mortg. Trust, Inc. v. Gee (In re Gee),*
  2000 WL 23251 (S.D.N.Y. Jan. 12, 2000) .............................................14

*Enron Corp. v. Belo Co. (In re Enron Corp.),*
  No. 04 Civ. 1861,. slip op. (S.D.N.Y. Sept. 22, 2004) ..........................17

*Enron N. Am. Corp. v. Media Gen., Inc. (In re Enron Corp.),*
  2004 WL 1197243 (S.D.N.Y. May 28, 2004) ........................................18

*Enron N. Am. Corp. v. Random House, Inc. (In re Enron Corp.),*
  2007 WL 102085 (S.D.N.Y. Jan. 12, 2007) ......................................14, 17

*Enron N. Am. Corp. v. Random House, Inc. (In re Enron Corp.),*
  No. 03 Civ. 9312, slip. op. (S.D.N.Y. Jan. 28, 2004) ............................18

*Enron Power Mktg., Inc. v. City of Santa Clara (In re Enron Power Mktg., Inc.),*
  2003 WL 68036 (S.D.N.Y. Jan. 8, 2003) ...............................................18

# TABLE OF AUTHORITIES

**Page(s)**

*Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.),*
    No. 04 Civ. 509, slip op. (S.D.N.Y. Sept. 22, 2004) ..............................................................17

*Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.),*
    2004 WL 2149124 (S.D.N.Y. Sept. 23, 2004).........................................................................20

*Enron Power Mktg. Inc. v. Luzenac Am., Inc. (In re Enron Corp.),*
    No. 03 Civ. 1524, slip op. (S.D.N.Y. Mar. 25, 2004) ............................................................18

*Enron Wind Energy Sys., LLC v. Marathon Elec. Mfg. Corp. (In re Enron Corp.),*
    No. 04 Civ. 7950, slip op. (S.D.N.Y. Feb. 14, 2005)..............................................................17

*In re Fairfield Sentry Ltd.,*
    2010 WL 4910119 (S.D.N.Y. Nov. 22, 2010).........................................................................20

*Fisher v. Ins. Co. of State of Pa. (In re Pied Piper Casuals, Inc.),*
    48 B.R. 294 (S.D.N.Y. 1985)...................................................................................................12

*Forman v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA (In re County Seat Stores, Inc.),*
    2002 WL 141875 (S.D.N.Y. Jan. 31, 2002) ............................................................................10

*Hassett v. Indiana Bell Tel. Co. (In re CIS Corp.),*
    1992 WL 176482 (S.D.N.Y. July 17, 1992) ............................................................................12

*Kenai Corp. v. Nat'l Union Fire Ins. Co. (In re Kenai Corp.),*
    136 B.R. 59 (S.D.N.Y. 1992)...................................................................................................20

*Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2001-1 Ltd.,*
    Adv. Proc. No. 09-10302, slip op. (Bankr. S.D.N.Y. 2010) .....................................................1

*Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd. (In re Lehman Bros.
    Holdings Inc.),*
    422 B.R. 407 (Bankr. S.D.N.Y. 2010) .......................................................................................1

*Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.),*
    304 F.3d 223 (2d Cir. 2002).....................................................................................................14

*Nev. Power Co. v. Enron Power Mktg., Inc.,*
    No. 02 Civ. 7964, oral decision (S.D.N.Y. Jan. 23-24, 2003) ................................................18

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982)....................................................................................................................13

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),*
    4 F.3d 1095 (2d Cir. 1993).......................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

*Pension Benefit Guar. Corp. v. LTV Corp. (In re Chateaugay Corp.)*,
  86 B.R. 33 (S.D.N.Y. 1988)............................................................................23, 24

*Pereira v. Centel Corp. (In re Argo Commc'ns Corp.)*,
  1992 WL 75144 (S.D.N.Y. Mar. 30, 1992) ...........................................................11

*Point Blank Solutions, Inc. v. Robbins Geller Rudman & Dowd LLP (In re Point Blank Solutions, Inc.)*,
  2011 WL 1988817 (Bankr. D. Del. May 20, 2011) ...............................................15

*Ranch 1 Metro, Inc. v. State Nat'l Ins. Co. (In re Ranch 1 Inc.)*,
  2002 WL 31175184 (S.D.N.Y. Sept. 27, 2002).....................................................11

*Schneider v. Riddick (In re Formica Corp.)*,
  305 B.R. 147 (S.D.N.Y. 2004)...............................................................................20

*S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*,
  45 F.3d 702 (2d Cir. 1995).....................................................................................13

*United Illuminating Co. v. Enron Power Mktg., Inc. (In re Enron Corp.)*,
  2003 WL 22171695 (S.D.N.Y. Sept. 22, 2003)...............................................12, 18

*In re United States Lines, Inc.*,
  197 F.3d 631 (2d Cir. 1999)...................................................................................13

*Veyance Techs., Inc. v. Lehman Bros. Special Fin. Inc.*,
  2009 WL 4496051 (S.D.N.Y. Dec. 3, 2009) ...........................................11, 12, 18

*Wong v. HSBC USA Inc. (In re Lehman Bros. Holdings Inc.)*,
  Case No. 09 Civ. 06841 (LTS),
  Transcript of Ruling (S.D.N.Y. Oct. 14, 2009).....................................11, 12, 13, 15

<u>S</u><u>TATUTES</u>:

28 U.S.C. § 157.................................................................................................. *passim*

<u>O</u><u>THER</u> <u>A</u><u>UTHORITIES</u>:

1 Alan N. Resnick & Henry J. Sommer *Collier on Bankruptcy* ¶ 3.04 (16th ed. 2011)...............11

Defendants Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Derivative Products Inc. ("LBDP") and Defendant/Counterclaim Plaintiff Lehman Brothers Special Financing Inc. ("LBSF") (collectively, "Lehman") respectfully submit this memorandum of law in opposition to Plaintiff/Counterclaim Defendant Michigan State Housing Development Authority's ("MSHDA") motion to withdraw the reference (the "Motion").

## PRELIMINARY STATEMENT

This Motion seeking an order withdrawing the reference permissively under 28 U.S.C. § 157(d) is an attempt by MSHDA to deprive the bankruptcy court of its central role in marshaling the Lehman debtors' assets, administering the estates of some 23 debtors, and weighing competing creditor interests and claims with respect to a diminishing pool of assets in the largest bankruptcy case in history.  In short, MSHDA is unhappy with the bankruptcy court's construction and application of three provisions under title 11 of the United States Code (the "Bankruptcy Code") – Section 365(e) (*ipso facto* clauses), Section 541 (property of the estate) and Section 560 (safe harbors) – in two decisions not involving MSHDA.  It fears the bankruptcy court will rule that the contract provision at issue in this case also is an unenforceable *ipso facto* clause, not safe-harbored by Section 560.  The bankruptcy court, however, is the proper forum for litigating questions of bankruptcy law and claims by the debtors and against their assets.  And it is the bankruptcy court that should determine, in the first instance, the question of whether the contract provision at issue here is an unenforceable *ipso facto* clause under the Bankruptcy Code, and whether it is safe-harbored, particularly in this case where it was MSHDA that commenced an adversary proceeding in the very bankruptcy court from which it now seeks to escape. MSHDA mistakenly confuses this case with the bankruptcy court's prior decisions in *Lehman Bros. Special Fin. Inc. v. BNY Corp. Trustee Servs. Ltd.*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) (hereinafter "*BNY*"), and *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2001-1 Ltd.*,

Adv. Proc. No. 09-10302, *(In re Lehman Bros. Holdings Inc.)* slip op. (Bankr. S.D.N.Y. May 12, 2011) (hereinafter "*Ballyrock*") – two cases to which MSHDA was not a party and which arose in entirely different factual contexts.  This Court should reject MSHDA's tactic and should permit the bankruptcy court to consider and decide the core bankruptcy issues in this case.

Furthermore, MSHDA's outright forum shopping ought not to be countenanced. MSHDA goes to great lengths in its moving papers to suggest that the bankruptcy court's "unprecedented" application of *ipso facto* law in *BNY* will be raised again in this adversary proceeding and that, therefore, this case presents an opportunity for the district court to quell the purported unrest *BNY* may have caused in the financial markets.  In the first place, the *BNY* appeal is over; that case no longer exists.  More importantly, MSHDA's crystal ball needs a thorough polishing, as its dire predictions are off the mark.  *BNY* arose in an entirely different factual context – a "flip clause" contract provision in a complex CDO transaction governed by English law.[1]  This case, by contrast, does not involve a flip clause that modifies the priority of potential payment distributions; rather, the *ipso facto* clause here modifies the measure by which the value of terminated swap transactions is determined and presents a routine application of the *ipso facto* principle to a straightforward, bilateral contract provision.  There simply is nothing novel about the facts or legal issues presented in this case that warrants withdrawing the reference; and even if the application of settled *ipso facto* principles to the contract provision in this case is "novel," it is the bankruptcy court that should first determine the issue.

---

[1] In *BNY*, the contract provision at issue provided that LBSF would, in the normal course, receive a higher-priority payment than noteholders in the CDO transaction; the "flip clause," however, provided that in the event of a bankruptcy default relating to LBSF, after certain prerequisites occurred, including the termination of the transactions, the payment priority would flip, and LBSF would receive a lower-priority payment than the noteholders.

2

Most fundamentally, withdrawal of the reference in this case would mean that this Court would place itself in a position to second-guess Congress as to whether a district court should supplant the bankruptcy court's role in administering bankruptcy cases – and, here, the largest bankruptcy in United States history.  We respectfully suggest that this Court not dispense with the bankruptcy court's more than 32-months of day-to-day expertise in administering these bankruptcy cases and the knowledge and expertise it has developed in derivatives contracts and sorting out the merits (and demerits) of competing claims to the debtors' assets, or seek to assume that role for itself.

Here, this Motion is premature at best because the bankruptcy court, which is the proper forum for making the "coreness" determination, has not yet determined whether this action is a core proceeding, as required by 28 U.S.C. § 157(b)(3).  Even should this Court decide that it, and not the bankruptcy court, makes that initial determination of "coreness," the Court should find (as MSHDA asserted in its adversary complaint (at ¶ 16)) that this is a core proceeding under the non-exclusive provisions of 28 U.S.C. § 157(b)(2) because, among other things, this case involves: (i) "matters concerning the administration of the estate;" (ii) "counter-claims by the estate against persons" asserting claims against the estate; (iii) "proceedings affecting the liquidation of the estate or the adjustment of the debtor-creditor . . . relationship;" and (iv) questions involving the direct application of the Bankruptcy Code to a unique contract provision.  *See* 28 U.S.C. §§ 157(b)(2)(A), (C) & (O).  MSHDA's assertion that this case raises issues having "far reaching ramifications for the international securities markets" is an unsupportable exaggeration; rather, it raises narrow questions of bankruptcy law – affecting a small number of contracts, between debtor LBSF and ten counterparties, originally entered into

with debtor LBDP – that uniquely affects LBSF and its creditors, which the bankruptcy court should decide in the first instance.

The crux of the parties' dispute is whether MSHDA has paid LBSF the correct amount due upon termination of twenty interest rate swap transactions that were, in the aggregate, heavily in-the-money to LBSF at the time the Lehman entities filed their chapter 11 petitions in the fall of 2008. The resolution of that dispute turns largely on the applicability of the Bankruptcy Code's proscription on *ipso facto* clauses, and its limited safe-harbor protection, to the parties' underlying contract, not the application of state law breach of contract principles, as MSHDA incorrectly asserts in its papers. (MSHDA Mem. at 13, 16.)  Not only are questions concerning the proper application of the Bankruptcy Code squarely within the province of the bankruptcy court, but also, over the course of nearly three years, the bankruptcy court in this case has developed an expertise in dealing with myriad disputes arising out of Lehman's derivatives portfolio (more than one million transactions), including knowledge of the underlying contracts, industry practices and the broader interests of the various constituencies in Lehman's bankruptcy that may be affected by the resolution of issues in this case.  Such judicial expertise should not lightly be cast aside as MSHDA suggests.  Hence, as a matter of fundamental jurisprudence that has built up over decade upon decade, and to promote the interests of judicial efficiency, economy and the uniform administration of these complex bankruptcy cases, the bankruptcy court should in the first instance consider the claims in this case.  Accordingly, for the reasons set forth below, this Court should deny MSHDA's Motion.

## BACKGROUND

### A.   The Operative Agreements Between MSHDA and LBDP

LBSF's counterclaim in this case arises out of MSHDA's termination of twenty interest rate swap transactions (the "Transactions") governed by the terms of the standard form

International Swaps and Derivatives Association ("ISDA") Master Agreement, dated as of May 10, 2000 (the "Master Agreement"), Schedule to the Master Agreement, dated as of May 10, 2000 (the "Schedule"), and Assignment and Amendment Agreement, dated as of September 16, 2008 (the "Assignment Agreement"). In May 2000, MSHDA entered into the Master Agreement with LBDP, an affiliate of LBSF. At the same time, LBDP and MSHDA agreed to a Schedule that modified certain terms in the Master Agreement as described below. LBDP and MSHDA subsequently entered into a number of Transactions under the Master Agreement and Schedule.

Both LBDP and LBSF were subsidiaries of LBHI. LBSF was LBHI's primary derivatives trading entity. LBDP was a triple-A rated derivatives trading vehicle created to transact with counterparties that required its higher credit rating. To achieve its triple-A credit rating, LBDP was structured in a manner that required a mandatory termination and settlement of all its outstanding derivatives transactions at mid-market values determined by LBDP upon the occurrence of certain "Trigger Events," including, for example, a bankruptcy filing by LBHI. Thus, the Master Agreement and Schedule between LBDP and MSHDA provided that the occurrence of a Trigger Event constituted an Additional Termination Event that resulted in the termination and settlement of all outstanding derivatives transactions between LBDP and MSHDA at a mid-market value determined by LBDP. *See* Ex. A (Schedule Part 1(i)).[2]

As relevant here, LBDP and MSHDA agreed in the Schedule to modify the definition of "Market Quotation" for determining the Settlement Amount – in connection with termination of the Transactions upon the occurrence of a Trigger Event – to mean an amount

---

[2] Exhibits appear in the Declaration of Evert J. Christensen, Jr. filed contemporaneously herewith.

determined by LBDP to "be the mid-market value of the Transactions as of the close of business (New York time) on the Early Termination Date."  *See* Ex. A (Schedule Part 1(i)(2)).[3]

"Mid-market" is a term of art in the derivatives industry and represents the net present value of the parties' respective scheduled future payment obligations and receipts over the life of the transaction.  It is an objective method of determining the Settlement Amount because it does not take into consideration unique and potentially distortive market circumstances at the time of calculation, such as a dealer's willingness to enter into a transaction with the non-defaulting party.  The consequence of using mid-market values is that if LBDP had been "in-the-money" at the time of the early termination of the Transactions, then LBDP would receive a larger termination payment than it would if MSHDA used the standard Market Quotation method, because no discounts unique to such temporary market circumstances would be taken into account in determining the Settlement Amount.

If the Master Agreement and Transactions between LBDP and MSHDA were terminated by reason other than the occurrence of a Trigger Event, however, the standard terms of the Master Agreement applied, and the non-defaulting party would be entitled to value the terminated transactions using "Market Quotation" as defined in the Master Agreement.  *See* Ex.

---

[3] Part 1(i)(2) of the Schedule provides, in pertinent part:

> [T]he "Market Quotation" of a Terminated Transaction (which may be positive or negative) shall be the amount determined by [LBDP], using Market Rates and Volatilities and by polling the Dealer Group as required, to be the mid-market value of the Transaction as of the close of business (New York time) on the Early Termination Date.  [LBDP] shall perform such determinations in good faith in accordance with its usual operating procedures pursuant to industry standards. . . . For purposes of determining the Settlement Amount, Unpaid Amounts (which shall be determined by [LBDP]) in respect of the Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after the Early Termination Date is to be included.

A (Master Agreement § 6(e)(i)).  "Market Quotation" under the standard terms of the Master

Agreement involves a process that includes soliciting and obtaining quotations from other

dealers selected by the non-defaulting party for the amounts such dealers would pay (or would

demand to be paid) to enter into replacement transactions with the non-defaulting party.

**B.    Assignment of the Transactions From LBDP to LBSF**

On September 15, 2008, LBHI filed its petition under the Bankruptcy Code.  This

event constituted a Trigger Event and thus an Additional Termination Event under the Schedule

that required termination and settlement of all outstanding Transactions between LBDP and

MSHDA in accordance with the modified definition of "Market Quotation" (*i.e.*, the mid-market

valuation procedure) described above.  At the time, a Settlement Amount of approximately $53

million (excluding interest) would have been payable by MSDHA to LBDP.  Rather than

terminate and settle the Transactions for that value, however, LBDP and MSHDA agreed to

assign all of LBDP's rights and obligations under the Master Agreement, the Schedule and the

Transactions to LBSF – at the time, a non-bankrupt entity – through the Assignment Agreement.

The Assignment Agreement modified several provisions of the Master Agreement

and Schedule.  In particular, Paragraph 2 of the Assignment Agreement provides:

> Upon the termination of the Agreement, as assigned and amended
> pursuant to the terms hereof, and notwithstanding any other
> provision hereof or thereof, any Settlement Amount payable by the
> Counterparty shall be determined by LBSF pursuant to Part 1(i)(2)
> of the Schedule to the Agreement *unless an Event of Default
> described in Section 5(a)(i) or Section 5(a)(vii) of the Agreement
> has occurred with respect to LBSF as the Defaulting Party, in
> which event the Settlement Amount shall be determined pursuant to
> Section 6 of the Agreement as if LBSF is the Defaulting Party*.

*See* Ex. B (Assignment Agreement) (emphasis added).  In effect, the Assignment Agreement

adopts in place of the standard definition of Market Quotation in the Master Agreement a

modified valuation method (the mid-market valuation procedure) in almost all termination

scenarios, except in two circumstances set forth in the highlighted portion of Paragraph 2 above

(the "Subject Clause"), including the filing of a bankruptcy petition by LBSF (*i.e.*, an Event of

Default described in Section 5(a)(vii) of the Master Agreement).[4]   The Subject Clause thus

purports to create an alternative method for determining the Settlement Amount that reduces the

amount payable to LBSF in the event of LBSF's bankruptcy filing and, therefore, the Subject

Clause is an invalid *ipso facto* clause under Sections 365 and 541 of the Bankruptcy Code.[5]

### C. The *Ipso Facto* Event: LBSF's Bankruptcy Filing and Transformation of the Valuation Measure

On October 3, 2008, LBSF filed its chapter 11 petition.[6]   More than one month

later, on November 5, 2008, MSHDA declared an Event of Default under the Master Agreement

as a result of LBSF's bankruptcy filing and designated that date as the Early Termination Date

for all Transactions then outstanding.   The mid-market value of the terminated Transactions at

the close of business on November 5, 2008, as calculated by LBSF, was $59,401,019.   On

November 7, 2008, however, MSDHA sent LBSF a calculation statement, stating that "[i]n

accordance with the Master Agreement, calculations using both Second Method, Market

Quotations ($35,177,450) and Loss ($1,389,168) for the Terminated Transactions results in a

---

[4] As previously noted, this language appears in approximately ten assignment agreements between debtor LBSF and counterparties who previously faced debtor LBDP.

[5] The Subject Clause is not protected by the statutory safe-harbor created by Section 560 of the Bankruptcy Code, as MSHDA suggests.   (MSHDA Mem. at 21-22.)   To the contrary, the plain language of Section 560 makes clear that only (i) the right to "liquidat[e], terminat[e] or accelerat[e]" or (ii) the right to "offset or net out the termination values or payment amounts" under or in connection with such an agreement is protected by the safe-harbor.   Contract rights that are merely ancillary to the right to terminate, liquidate or accelerate – such as here, the method by which the Settlement Amount is determined – are not protected.   *See, e.g., Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.)*, 2009 WL 1578282, at *6 (S.D.N.Y. May 7, 2009).

[6] LBDP filed its chapter 11 petition on October 5, 2008.

payment to LBSF in the amount of $36,566,618."[7]  Thus, by applying the Subject Clause, MSHDA reduced the amount it was required to pay LBSF by approximately $23 million.

### D.   **Procedural History**

MSHDA commenced this adversary proceeding against LBSF, LBDP and LBHI on November 16, 2009 seeking damages for, among other things, claims sounding in unjust enrichment.  On January 13, 2010, LBSF, LBDP and LBHI filed their answer and affirmative defenses to MSHDA's Complaint.  LBSF also filed a counterclaim against MSHDA seeking damages in connection with MSHDA's termination of the Transactions in November 2008.  MSHDA filed its answer and affirmative defenses to the counterclaim on January 22, 2010.

On March 12, 2010, and again on June 9, 2010, the parties agreed to stay the adversary proceeding in order to engage in alternative dispute resolution ("ADR") pursuant to the bankruptcy court's Alternative Dispute Resolution Procedures Order for Affirmative Claims of the Debtors Under Derivatives Contracts, dated September 17, 2009.  On March 15, 2010, LBSF served an ADR notice on MSHDA, and the parties engaged in the ADR procedures over the ensuing months, as required by the bankruptcy court's ADR procedures order.[8]

On December 17, 2010, the parties' ADR efforts resulted in mediation before retired Bankruptcy Judge Ralph R. Mabey.  From commencement of the ADR process, MSHDA was made aware, by way of the ADR pleadings, discussions between the parties and LBSF's mediation statement, that the Bankruptcy Code's *ipso facto* and safe harbor provisions were

---

[7] After taking certain other deductions, MSHDA determined that the amount payable to LBSF by MSHDA was $36,346,426.  That amount was paid to LBSF on or about November 7, 2008.

[8] On July 19, 2010, although the agreed-upon ADR procedure had not yet commenced, MSHDA unilaterally (and, in any event, improperly, under the applicable rules) sought to resume discovery in the adversary proceeding by serving discovery requests.  On September 22, 2010, at a status conference requested by MSHDA, the bankruptcy court ordered a stay of any discovery in the adversary proceeding until the ADR procedures had concluded.

central issues.  The parties were unable to reach an agreement to resolve their dispute, and Judge

Mabey concluded the mediation on December 28, 2010.  Thereafter, LBSF filed a motion to

amend its counterclaim to amplify its allegations against MSHDA and to add, among other

things, a declaratory judgment claim that properly framed the *ipso facto* issues that had been the

focus of LBSF's claims throughout the mediation process.  MSHDA did not oppose the motion,

and the bankruptcy court granted LBSF leave to file an amended counterclaim on January 13,

2011.  LBSF filed its amended counterclaim on January 18, 2011, and MSHDA filed an answer

on January 31, 2011.  MSHDA then leisurely filed this Motion to withdraw the reference after it

waited over a year since LBSF put it on notice of the *ipso facto* and safe-harbor issues in this

case; waited again while LBSF moved (unopposed) to amend its counterclaim in the bankruptcy

court; and then did nothing for another four months until the bankruptcy court entered its ruling

in *Ballyrock* (another "flip clause" case).

## <u>ARGUMENT</u>

## I.    THE LEGAL STANDARD FOR WITHDRAWAL OF THE REFERENCE

MSHDA has moved pursuant to 28 U.S.C. § 157(d) seeking the permissive

withdrawal of the bankruptcy reference in this adversary proceeding.  Section 157(d) provides

that "[t]he district court *may* withdraw, in whole or in part, any case or proceeding referred under

this section . . . for cause shown."  28 U.S.C. § 157(d) (emphasis added).  The statute does not

define "cause," but the Second Circuit has identified several factors a district court may consider

in determining whether "cause" exists, including: "(i) whether the proceeding is core or non-

core; (ii) judicial economy; (iii) uniformity of bankruptcy administration; (iv) economical use of

the debtors' and creditors' resources; (v) reduction of forum shopping; (vi) expediting the bank-

ruptcy process; and (vii) the presence of a jury demand."  *Forman v. Nat'l Union Fire Ins. Co. of

Pittsburgh, PA (In re County Seat Stores, Inc.)*, 2002 WL 141875, at *4 (S.D.N.Y. Jan. 31, 2002)

(Koeltl, J.) (citing *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993)).  Moreover, courts have interpreted Section 157(d) "to be of limited scope, with withdrawal being the exception rather than the rule."  *Pereira v. Centel Corp. (In re Argo Commc'ns Corp.)*, 1992 WL 75144, at *2 (S.D.N.Y. Mar. 30, 1992).  And, "[e]ven if cause exists . . . there is no mandate that the reference must be withdrawn.  By using the permissive 'may,' Congress has made it clear that withdrawal . . . is discretionary."  Alan N. Resnick & Henry J. Sommer, 1 *Collier on Bankruptcy* ¶ 3.04[1][b] (16th ed. 2011).

Two different judges in this District already have denied motions to withdraw the reference in the Lehman bankruptcy cases.  *See Veyance Techs., Inc. v. Lehman Bros. Special Fin. Inc.*, 2009 WL 4496051, at *2 (S.D.N.Y. Dec. 3, 2009) (Jones, J.); Transcript of Ruling, *Wong v. HSBC USA Inc. (In re Lehman Bros. Holdings Inc.)*, Case No. 09 Civ. 06841 (LTS), (S.D.N.Y. Oct. 14, 2009) (Swain, J.).[9]  This Court should do the same here.

## II.   MSHDA'S MOTION IS PREMATURE BECAUSE THE BANKRUPTCY COURT SHOULD FIRST DETERMINE WHETHER THIS ACTION IS CORE

As a threshold issue, 28 U.S.C. § 157(b)(3) provides that "the bankruptcy judge shall determine . . . whether a proceeding is a core proceeding under this subsection . . . ."  Given the "plain and unambiguous language" of Section 157(b)(3), numerous courts in this District "have determined 'that before a withdrawal of the reference motion is presented to the District Court, the bankruptcy judge *must* make the determination of whether proceedings are core or non-core.'"  *Ranch 1 Metro, Inc. v. State Nat'l Ins. Co. (In re Ranch 1 Inc.)*, 2002 WL 31175184, at *2 (S.D.N.Y. Sept. 27, 2002) (citation omitted) (emphasis added); *see also Veyance Techs.*, 2009 WL 4496051, at *2 (holding that a motion to withdraw the reference was "premature" because the bankruptcy court had not determined whether the proceeding was core or non-core);

---

[9] A copy of the *Wong* transcript ruling is attached as Exhibit C to the Christensen Declaration.

*Hassett v. Indiana Bell Tel. Co. (In re CIS Corp.)*, 1992 WL 176482, at *2 (S.D.N.Y. July 17, 1992) (holding that "[t]o permit the withdrawal at this stage on the ground that the proceeding is non-core would flout § 157(b)(3) by removing from the bankruptcy court the decision as to whether an action is core"); *Fisher v. Ins. Co. of State of Pa. (In re Pied Piper Casuals, Inc.)*, 48 B.R. 294, 294-95 (S.D.N.Y. 1985) (same).  Indeed, the sound policy reasons for requiring the bankruptcy court to determine whether a proceeding is core or non-core are obvious: the bank-ruptcy court is typically better suited to decide whether an issue is core given its special expertise in bankruptcy matters and its familiarity with the specific bankruptcy case at issue.

    "While there is a split in this circuit as to whether it is mandatory to allow the bankruptcy court to determine in the first instance if a matter is core, even those courts that have not interpreted § 157(b)(3) as requiring mandatory deferral to the bankruptcy court have deferred unless the moving party provided a compelling reason not to do so."  *Veyance Techs.*, 2009 WL 4496051, at *2 (citing *United Illuminating Co.v. Enron Power Mktg., Inc. (In re Enron Corp.)*), 2003 WL 22171695, at *2 (S.D.N.Y. Sept. 22, 2003)); *see also Wong*, Tr. at 31 ("Section 157(b)(3), indicates that, at least in the normal course, the bankruptcy judge would make the determination as to whether the proceeding is core . . . this Court does not believe that it is necessary to exercise any power it has to make this determination . . . .").  Here, as in *Veyance Technologies* and *Wong*, MSHDA has not even addressed, much less provided "a compelling reason," why the bankruptcy court should not determine in the first instance whether this is a core proceeding, as required by 28 U.S.C. § 157(b)(3).  Accordingly, MSHDA's motion to withdraw the reference should be denied as premature, until the bankruptcy court determines whether this is a core or a non-core proceeding.

III.    THE *ORION* FACTORS WEIGH HEAVILY AGAINST WITHDRAWING THE
        REFERENCE IN THIS CASE

Even should the Court decline to defer to the bankruptcy court in determining in
the first instance whether this adversary proceeding is core – which it should not – the Court
should deny MSHDA's Motion.  The *Orion* factors weigh heavily against withdrawing the
reference and militate in favor of permitting the bankruptcy court to retain jurisdiction over this
adversary proceeding.

A.    <u>This Action Raises Core Bankruptcy Issues</u>

The bankruptcy court's "core" jurisdiction is "construed as broadly as possible
subject to the constitutional limits" established by the Supreme Court in *Northern Pipeline*
*Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).  *S.G. Phillips Constructors,*
*Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702, 705 (2d Cir.
1995).  To be sure, the Second Circuit has repeatedly quoted with approval Justice Breyer's
analysis (as a member of the First Circuit) of the legislative history of 28 U.S.C. § 157:

> [T]he legislative history . . . indicates that Congress intended that
> "core proceedings" would be interpreted broadly, close to or
> congruent with constitutional limits.  The sponsors repeatedly said
> that 95 percent of the proceedings brought before bankruptcy
> judges would be core proceedings.  They used arguments strongly
> suggesting that they were pressing the notion to its constitutional
> bounds.  They referred to the suits in the non-core category as
> "*Marathon*-type" cases, which they understood would be
> proceedings of a "very limited kind."

*Arnold Print Works, Inc. v. Apkin (In re Arnold Print Works, Inc.)*, 815 F.2d 165, 168 (1st Cir.
1987) (Breyer, J.) (citation omitted), *quoted in In re U.S. Lines, Inc.*, 197 F.3d 631, 635-37 (2d
Cir. 1999) *and Ben Cooper, Inc. v. Ins. Co. of the State of Pa. (In re Ben Cooper, Inc.)*, 896 F.2d
1394, 1398-99 (2d Cir.), *vacated on other grounds*, 498 U.S. 964 (1990); *see also Wong*, Tr. at
32 ("As the Second Circuit and other courts have recognized, Congress intended the concept of

the core proceeding to be broad in response to the *Marathon* decision"). "Proceedings that are

core are those that are unique to, or uniquely affected by, the bankruptcy proceedings, or that

directly affect a core bankruptcy function." *Enron N. Am. Corp. v. Random House, Inc. (In re*

*Enron Corp.)*, 2007 WL 102085, at *1 n.1 (S.D.N.Y. Jan. 12, 2007) (citing *Luan Inv. S.E. v.*

*Franklin 145 Corp. ( In re Petrie Retail, Inc.)*, 304 F.3d 223, 229 (2d Cir. 2002)).

   MSHDA itself has asserted in the bankruptcy court that this "is a core proceeding

pursuant to 28 U.S.C. § 157(b)." *See* Ex. D (MSHDA Complaint ¶ 16). Yet, MSHDA now

argues, in its effort to avoid the bankruptcy court, that this adversary proceeding is not core

because "breach of contract claims by the estate against a third party – such as LBSF's

counterclaims – are paradigmatic non-core proceedings." MSHDA Mem. at 16. To support this

misguided argument, MSHDA stoops to mischaracterizing the thrust of LBSF's counterclaim, in

which LBSF primarily seeks a declaration that certain provisions in the parties' agreement are

void and unenforceable *ipso facto* clauses, under Sections 365 and 541 of the Bankruptcy Code.

The secondary aspects of LBSF's counterclaim against MSHDA – namely, whether MSHDA

breached the contract and/or has been unjustly enriched by its actions – depend in large measure

on the resolution of the declaratory judgment action. And, in any event, it is well-settled that the

determination of whether a proceeding is "core" under 28 U.S.C. § 157(b)(3) "shall not be made

solely on the basis that its resolution may be affected by state law." *Cape Cod Mortg. Trust, Inc.*

*v. Gee (In re Gee)*, 2000 WL 23251, at *2 (S.D.N.Y. Jan. 12, 2000) (Jones, J.). "The relevant

inquiry is whether the nature of the adversary proceeding, rather than the state or federal basis

for the claim, falls within the core of the federal bankruptcy power." *Id.* (citations omitted).

   Here, the questions of whether the contract provision at issue is void and unenfor-

ceable under Sections 365 and 541 (or safe-harbored under Section 560) of the Bankruptcy

Code, and therefore whether MSHDA is liable to LBSF for the additional termination amount claimed in LBSF's counterclaim, must be considered a core proceeding.  The *ipso facto* principles and the applicability of the safe-harbor can only apply in the context of a bankruptcy proceeding, and the debtors' claim to property of the estate goes to the very heart of the administration of the Lehman bankruptcy.  *See, e.g.*, *Point Blank Solutions, Inc. v. Robbins Geller Rudman & Dowd LLP (In re Point Blank Solutions, Inc.)*, 2011 WL 1988817, at *3 (Bankr. D. Del. May 20, 2011) ("Debtor's claims for declaratory relief and for turnover of estate assets are core proceedings"); *Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.)*, 437 B.R. 88, 96-97 (S.D.N.Y. 2010) (Marrero, J.) ("a declaratory judgment proceeding that 'set[s] the table for a determination under title 11' for the operation of the Bankruptcy Court's core functions, such as allowance or disallowance of claims or the administration of the estate, is a core proceeding"); *Wong*, Tr. at 31-32 ("the Court knows there is, at a minimum, a very strong argument that . . . claims . . . are core, at least to the extent they go to the question of whether particular assets are property of the estate and implicate . . . the control of property that is claimed to be property of the estate, which is certainly a matter that affects the administration of the estate within the type of actions and causers of action contemplated by the nonexclusive list of core proceedings in Section 157(b)(2) of Title 28.").

 *Camp v. National Union Fire Insurance Co. of Pittsburgh, PA (In re Government Securities Corp.)*, 111 B.R. 1007 (S.D. Fla. 1990), is instructive.  That case involved the issue of whether an automatic termination provision in a fidelity bond was void and unenforceable under Section 541(c)(1)(B) of the Bankruptcy Code – one of the provisions of the Bankruptcy Code at issue here and which contains the same *ipso facto* language as Section 365(e).  The court held that the bankruptcy court correctly determined that the proceeding was "core," because:

> 11 U.S.C. Section 541(c)(1)(B) creates substantive rights unknown at state law.  Although GSC's right to recovery was pursuant to the bond, a legal right created under state law, the Trustee's ability to preserve rights under the bond exists solely under the Bankruptcy Code . . . As the Trustee correctly argues, this is not simply a state law contract action which, had there been no bankruptcy, could have proceeded in a state court.  Application of Section 541(c)(1)(B) could not be contemplated outside of bankruptcy, and the controversy involving payment of a bond affects the liquidation of the debtor's assets.  Accordingly, this matter comes within the ambit of "core" proceedings, giving the bankruptcy court subject matter jurisdiction to hear and determine the instant case.

*Camp*, 111 B.R. at 1010 (citations omitted).

Likewise, the issues framed in this case are undoubtedly within the core juris-diction of the bankruptcy court, as set forth in Section 157(b)(2), because they concern: (i) "the administration of the estate;" (ii) "counterclaims by the estate against persons filing claims against the estate;" (iii) "proceedings affecting the liquidation of the estate or the adjustment of the debtor-creditor . . . relationship;" and (iv) questions that turn largely on the application of the Bankruptcy Code and other bankruptcy principles to a peculiar contract provision that exists in agreements between debtor LBSF and nine other counterparties.  Indeed, at bottom, MSHDA asks this Court to consider the *ipso facto* issues in this case on summary judgment (MSHDA Mem. at 3-4, 23) – plainly core questions involving the application of the Bankruptcy Code to the parties' contract.  Thus, consistent with the statutory scheme set forth in the Bankruptcy Code, the bankruptcy court should be given the opportunity to consider the claims asserted in this adversary proceeding, given its central role in the Lehman bankruptcy, and its knowledge of the various constituency interests that may be affected by this litigation.

**B.      Allowing the Bankruptcy Court to Retain Jurisdiction Over This Action Will Promote Judicial Economy and Efficiency**

MSHDA's Motion seeking the permissive withdrawal of the bankruptcy reference would eviscerate the fundamental role of the bankruptcy court in administering Lehman's

bankruptcy – the largest in United States history.  The expertise of the bankruptcy court and its practical experience in the day-to-day administration of these extraordinarily complex bankruptcy proceedings must not be so lightly cast aside.  Promoting the interests of judicial economy and efficiency, and the uniform administration of these complex proceedings, therefore, weighs heavily against withdrawing the reference in this adversary proceeding.

The bankruptcy court is in the process of adjudicating numerous disputes between LBSF and various counterparties concerning interest rate swap transactions, and has developed expertise with respect to this form of contract and the practicalities of the swaps and derivatives business.  Given the number of other related proceedings before the bankruptcy court that concern derivative transactions, the uniform administration of justice and this bankruptcy case militates against withdrawing the reference in this case.  As Judge Swain (one of at least nine district court judges who denied motions to withdraw the reference in at least twelve different adversary proceedings in Enron) observed in the Enron bankruptcy cases, "[i]t would not serve the interests of efficient administration of the bankruptcy system for this court to pre-empt prematurely or unnecessarily in a single adversary proceeding the bankruptcy court's ability, pursuant to 28 U.S.C. section 157(b)(3), to address these issues in the broader context of Enron's bankruptcy case."  *Enron*, 2007 WL 102085, at *3.[10]  Indeed, Judge Jones already reached a

---

[10] The District Court routinely denied motions to withdraw the reference in connection with the Enron bankruptcy proceedings "whether discretionary or mandatory," because "[t]he Bankruptcy Court has presided over the Enron bankruptcy for cases for over three years . . . [and] is more thoroughly familiar with the Debtors claims and issues in the instant matter and all of the other Enron-related cases."  *California v. Enron Corp. (In re Enron Corp.)*, 2005 WL 1185804, at *3 (S.D.N.Y. May 18, 2005) (Daniels, J.) (citing *Enron Wind Energy Sys., LLC v. Marathon Elec. Mfg. Corp. (In re Enron Corp.)*, No. 04 Civ. 7950, slip op. (S.D.N.Y. Feb. 14, 2005) (Buchwald, J.); *Amerada Hess Corp. v. Enron Corp. (In re Enron Corp.)*, No. 03 Civ. 5288, slip op. (S.D.N.Y. Sept. 24, 2004) (Chin, J.); *Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.)*, No. 04 Civ. 509, slip op. (S.D.N.Y. Sept. 22, 2004) (Mukasey, J.); *Enron Corp. v. Belo Co. (In re Enron Corp.)*, No. 04 Civ. 1861, slip op. (S.D.N.Y. Sept. 22, 2004) (Mukasey, J.);

similar conclusion with respect to LBSF's derivatives transactions in the Lehman bankruptcy

proceedings, where the parties disputed whether a derivative contract had been formed:

> The Bankruptcy Court is in the process of adjudicating numerous
> disputes between LBSF and various other counterparties
> concerning interest rate swap transactions, and has developed
> expertise with respect to this complex form of contract.  These
> disputes do not focus solely around issues of New York state law,
> but also upon the materiality of terms in derivative transactions and
> industry practice.  Thus, the Bankruptcy Court may be best
> equipped to adjudicate the present dispute due to its exposure to
> LBSF's business, the contract terms at issue here, the complex type
> of transaction at issue here, and the practices of the swap industry.
> The Court thus declines to withdraw the reference at this time.

*Veyance Techs.*, 2009 WL 4496051, at *2.  As in *Veyance Technologies*, the bankruptcy court is

best equipped to consider and resolve the parties' arguments with respect to the application of

Sections 365, 541 and 560 of the Bankruptcy Code to the derivatives contract at issue here, given

its extensive exposure to LBSF's derivatives business.

MSHDA's arguments that withdrawing the reference in this case will promote

judicial efficiency and economy are without merit.  (MSHDA Mem. at 19-21.)  First, as

discussed above, because the claims in this adversary proceeding include a counterclaim by

LBSF against MSHDA in connection with its claims against the LBSF estate, proceedings that

will affect the liquidation of the Lehman estates, and the application of provisions of the

Bankruptcy Code to the facts of this case, it is undoubtedly a core proceeding, and therefore the

---

*Enron N. Am. Corp. v. Media Gen., Inc. (In re Enron Corp.)*, 2004 WL 1197243 (S.D.N.Y. May
28, 2004) (Stein, J.); *Enron Power Mktg. Inc. v. Luzenac Am., Inc. (In re Enron Corp.)*, No. 03
Civ. 1524, slip op. (S.D.N.Y. Mar. 25, 2004) (Preska, J.); *Enron N. Am. Corp. v. Random House,
Inc. (In re Enron Corp.)*, No. 03 Civ. 9312, slip op. (S.D.N.Y. Jan. 28, 2004) (Swain, J.); *United
Illuminating Co. v. Enron Power Mktg., Inc. (In re Enron Corp.)*, 2003 WL 22171695 (S.D.N.Y.
Sept. 22, 2003) (Cote, J.); *Am. Coal Co. v. Enron N. Am. Corp.*, No. 03 Civ. 1727, oral decision
(S.D.N.Y. June 25, 2003) (Swain, J.); *Nev. Power Co. v. Enron Power Mktg., Inc.*, No. 02 Civ.
7964, oral decision (S.D.N.Y. Jan. 23-24, 2003) (Baer, J.); *Enron Power Mktg., Inc. v. City of
Santa Clara (In re Enron Power Mktg., Inc.)*, 2003 WL 68036 (S.D.N.Y. Jan. 8, 2003) (Baer, J.).

findings of the bankruptcy court will not be subject to *de novo* review in the district court.  *See* 28 U.S.C. § 157(c)(1).  Rather, any review of the issues in this adversary proceeding by the district court will be an appellate review, following factual findings and legal rulings by the bankruptcy court.  Thus, there will be no need for the district court to duplicate the bankruptcy court's efforts, should this case later be presented on appeal.

MSHDA's next argument, that it could be found liable to LBSF for contractual interest on any unpaid termination amount in connection with this litigation, does not favor withdrawal of the reference to expedite this litigation.  The claimed harm is speculative; it rests entirely on the unsupported and unverifiable assumption that proceedings take less time if the case is transferred to this Court than they would if the case remains in the bankruptcy court where MSHDA initiated it.  By MSHDA's logic, the parties to this adversary proceeding (indeed, any adversary proceeding) should proceed directly to the Supreme Court (or at least the Second Circuit) to avoid any possibility of additional cost or delay that might accompany any subsequent appeal.  Further, there is no support for MSHDA's conclusory assertion that the bankruptcy court will be unable to handle this adversary proceeding due to its "tremendous work load."  Over the course of the Lehman bankruptcy, Judge Peck has proven his ability to resolve myriad complex issues in various adversary proceedings in a timely, fair and consistent fashion while simultaneously administering the other affairs of the Lehman bankruptcy.

Finally, MSHDA cannot be heard to complain that withdrawal is necessary to "minimize delay" in this proceeding.  (MSHDA Mem. at 20-21.)  MSHDA has known about the *ipso facto* and safe-harbor issues in this case for over a year, sat idly by when LBSF moved in the bankruptcy court to amend its counterclaim, and then did nothing for another four months after LBSF filed its amended counterclaim.  It was only after the bankruptcy court decided

*Ballyrock* – which MSDHA perceives as unfavorable indicator of the outcome on the *ipso facto* and safe-harbor issues in this case – that MSHDA decided there was a need to shop for another forum in which to litigate, and initiated this Motion to flee the bankruptcy court under the guise of seeking to expedite these proceedings. *See* Background Point D, *supra*. MSHDA's concern over "delays" is obviously feigned, as any supposed "delay" in the resolution of the issues in this case is merely a natural by-product of MSHDA's tactical and procedural maneuvers.

In sum, as did at least nine different district court judges in the Enron bankruptcy cases, and as Judge Jones and Judge Swain already have concluded in the Lehman bankruptcy cases, this Court should not withdraw the reference in the interests of judicial economy, efficiency and the uniform administration of the bankruptcy proceeding, and should instead allow the bankruptcy court to consider the issues presented in this adversary proceeding.

## C.   MSHDA's Motion is Nothing More than an Attempt at Forum Shopping

Another important *Orion* factor is the abatement of possible forum shopping by parties who perceive the bankruptcy court as an unfavorable forum in which to litigate their claims. Thus, as this Court noted in *Schneider v. Riddick (In re Formica Corp.)*, "courts should employ withdrawal 'judiciously in order to prevent it from becoming just another litigation tactic for parties eager to find a way out of bankruptcy court.'" 305 B.R. 147, 151 (S.D.N.Y. 2004) (Koeltl, J.) (quoting *Kenai Corp. v. Nat'l Union Fire Ins. Co. (In re Kenai Corp.)*, 136 B.R. 59, 61 (S.D.N.Y. 1992) (Wood, J.)); *see also In re Fairfield Sentry Ltd.*, 2010 WL 4910119, at *4 (S.D.N.Y. Nov. 22, 2010) (Preska, C.J.) (to "allay" concerns of forum-shopping "'courts in this Circuit have construed Section 157(d) narrowly in order to prevent an 'escape hatch' out of bankruptcy court'" (quoting *Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.)*, 2004 WL 2149124, at *5 (S.D.N.Y. Sept. 23, 2004) (Mukasey, J.))).

MSHDA's motion does little to mask its effort to avoid the jurisdiction of the bankruptcy court in this adversary proceeding.  The central theme of the motion is MSHDA's belief, based on the bankruptcy court's decisions on "flip causes" in *BNY* and *Ballyrock*, that the contract provision at issue in this adversary proceeding will be deemed by the bankruptcy court to be a void and unenforceable *ipso facto* clause under Sections 365 and 541 of the Bankruptcy Code.  In a desperate effort to avoid that result, MSHDA goes to great lengths to contend that the application of the Bankruptcy Code to the facts of this case is not a core proceeding, and to concoct an argument that the bankruptcy court's application of the relevant Bankruptcy Code provisions to entirely different facts and circumstances in the *BNY* case somehow raises "issues of first impression" and novel questions of bankruptcy law of such "global importance" that MSHDA should be allowed to challenge them in this case and in this Court.  Not only is the factual setting of this case entirely different from *BNY*, as discussed below, such that the bankruptcy court in any event should be given the first opportunity to consider these issues, but also this blatant attempt at forum-shopping to avoid what MSHDA perceives as an unfavorable judge in the bankruptcy court should not be countenanced.

### D.    The Remaining *Orion* Factors Weigh Against Withdrawal Here

MSHDA does not even attempt to argue in its moving papers that the remaining *Orion* factors – economical use of the debtors' and creditors' resources, expediting the bankruptcy process and the presence of a jury demand – support a permissive withdrawal of the bankruptcy reference in this case.  Withdrawing the reference in this single adversary proceeding will not promote the economical use of the debtors' and creditors' resources because this Court, unlike the bankruptcy court, is not steeped in the intricacies of the Lehman bankruptcy cases or the details of LBSF's derivatives portfolio; thus, the Lehman debtors (and their creditors) may be required to expend additional resources from a diminishing pool of assets to properly litigate

these issues before this Court, rather than the bankruptcy court.  Nor will resolving the issues raised in this adversary proceeding contribute toward expediting the resolution of the Lehman bankruptcy proceedings.  The peculiar legal issue in this case affects only a handful of counterparties (in a derivative portfolio of more than one million transactions), and the resolution of these issues by the district court will not promote a more expeditious resolution of the numerous other open issues in the Lehman bankruptcy cases.  If anything, the piecemeal adjudication of this matter separate and apart from the bankruptcy court's global consideration of the many other competing debtor and creditor interests may hamper the fair and efficient resolution of these bankruptcy cases.  Finally, MSHDA has not made a jury demand in this case, and, therefore, this factor does not favor withdrawal of the reference.

## IV. MSHDA'S CONTENTION THAT THIS ACTION PRESENTS "ISSUES OF FIRST IMPRESSION" IS MISGUIDED AND WRONG

Recognizing that there is little or no basis for permissive withdrawal of this adversary proceeding under Section 157(d) and the *Orion* factors, MSHDA instead resorts to asserting that this case raises an "issue of first impression and global importance" because the outcome here "turns in substantial part on the correctness of the bankruptcy court's holding in [*BNY*]."  MSHDA Mem. at 21.  The correctness of the bankruptcy court's decision in *BNY*, however, turns on its application of Sections 365, 541 and 560 of the Bankruptcy Code to the particular contract provisions and factual circumstances at issue in *BNY* – a "flip clause" provision in a complex CDO structure governed by English law.  Here, by contrast, the bankruptcy court will consider whether a single bilateral contract provision specifying the method by which the termination payment owed by MSHDA to LBSF is to be calculated is void and unenforceable under the *ipso facto* provisions of the Bankruptcy Code.  And far from raising issues of "global importance" and enabling "a host of other market-unsettling litigation [to] be

brought to a swift conclusion" (MSHDA Mem. at 21-22), the resolution of the issues in this case will directly impact nine other cases involving LBSF counterparties with the same unique contract provision.  There simply will be no far-reaching effect or consequence resulting from the application of established *ipso facto* principles to this particular contract provision outside of the Lehman bankruptcy.

MSHDA relies on *Pension Benefit Guaranty Corp. v. LTV Corp. (In re Chateaugay Corp.)*, 86 B.R. 33 (S.D.N.Y. 1988), to support its argument that a district court should withdraw the reference in cases raising "significant issues of first impression."  MSHDA Br. at 22.  But *Chateaugay* is easily distinguished.

*Chateaugay* involved actions by the Pension Benefit Guaranty Corporation ("PBGC"), a "wholly-owned United States government corporation."  86 B.R. at 35.  In connection with LTV's bankruptcy, PBGC initiated proceedings under the ERISA statute to terminate LTV's pension plans and to be appointed statutory trustee for the plan assets.  *Id.*  In the course of events, however, PBGC sent LTV a notice reinstating the previously terminated pension plans.  *Id.* at 36.  Importantly, "PBGC's action marked the first time it had exercised its statutory authority . . . to restore a pension plan that had been terminated."  *Id.*  In response, LTV filed a motion in the bankruptcy court seeking to enforce the automatic stay.  *Id.*  The district court concluded that withdrawal was mandatory because the case involved "'issues requiring significant *interpretation* of federal laws that Congress would have intended to have decided by a district judge rather than a bankruptcy judge.'"  *Id.* (citation omitted) (emphasis in original).  The court held that "a district court *must* decide this conflict of first impression between ERISA and the Code."  *Chateaugay*, 86 B.R. at 37 (emphasis added); *see also id.* at 38-39 ("[T]he ERISA

issues are . . . presented in sharp conflict with competing provisions of the [Bankruptcy] Code. Withdrawal of this proceeding is mandatory.").

Only after the court conducted an extensive analysis of the reasons supporting the mandatory withdrawal of the reference in *Chateaugay*, did it devote a single paragraph to the permissive withdrawal of the bankruptcy reference in that case given "the presence of significant issues of first impression, considerations of judicial economy, and the need to protect participants in the restored Plans from unduly protracted uncertainty about the status of their benefits . . . ." *Id.* at 39. *Chateaugay* thus stands in sharp contrast to the straightforward application of the Bankruptcy Code presented in this adversary proceeding. There is no first-time assertion of statutory authority by a government corporation; no conflict between provisions of the Bankruptcy Code and other federal statutes requiring "significant interpretation" by the district court; and no uncertainty for individuals concerning their pensions.

Even assuming, *arguendo*, that some merit could exist as to MSHDA's suggestion that the bankruptcy court's decision in *BNY* "'has potentially far-reaching ramifications for the international securities markets' and 'has triggered significant uncertainty in the financial community,'" MSHDA Mem. at 22, the bankruptcy court's application of *ipso facto* principles in *BNY* was addressed to an entirely different factual scenario having to do with the impact of the Bankruptcy Code on contractual "flip clause" provisions in complex CDO transactions. This case, on the other hand, presents the straightforward issue of whether LBSF's bankruptcy filing triggered an unenforceable *ipso facto* clause modifying the termination payment measure in the parties' bilateral agreement. There is nothing novel about that issue or any ruling the bankruptcy court might make on that issue. And even if the application of settled *ipso facto* principles to the specific contract provision at issue here were deemed novel (but by no means an "issue of first

impression" in the bankruptcy law), it is the bankruptcy court that should decide these core issues in the first instance given its expertise in applying the bankruptcy law, its deep knowledge of Lehman's complex derivatives portfolio, and its unique understanding of the competing interests in the Lehman bankruptcy cases.

In sum, MSHDA's fictive hope that withdrawing the reference in this case might "right the wrong" (allegedly) that *BNY* represents misses the mark. That cannot happen here because of all the material differences in the facts and circumstances surrounding the *ipso facto* provisions at issue here and in *BNY*.

## CONCLUSION

For the foregoing reasons, Lehman respectfully requests that this Court deny MSHDA's motion to withdraw the reference in this adversary proceeding.

Dated: New York, New York
June 3, 2011

WEIL, GOTSHAL & MANGES LLP


By: /s/ Anthony J. Albanese
    Anthony J. Albanese
    Peter Gruenberger
    Evert J. Christensen, Jr.

767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

Attorneys for Debtors and Defendants Lehman Brothers Derivative Products Inc. and Lehman Brothers Holdings Inc. and Defendant/ Counterclaim Plaintiff Lehman Brothers Special Financing Inc.
